STATE OF CONNECTICUT *v.*
NICHOLAS A. BRUNETTI
(SC 16788)

Sullivan, C. J., and Borden, Katz, Palmer, Vertefeuille,
Zarella and Schaller, Js.*

* The listing of justices reflects their seniority status as of the date of oral argument.

40

Argued October 20, 2004—officially released July 11, 2006

*Richard Emanuel,* for the appellant (defendant).

*Robert J. Scheinblum,* assistant state's attorney, with whom, on the brief, was *Mary M. Galvin,* state's attorney, for the appellee (state).

Opinion

PALMER, J. In *State* v. *Brunetti,* 276 Conn. 40, 883 A.2d 1167 (2005), this court reversed the murder conviction of the defendant, Nicholas A. Brunetti, concluding that the consent search of his home violated the constitutional prohibition against unreasonable searches and seizures. In particular, the court agreed with the defendant's claim, raised for the first time on appeal pursuant to *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989),[1] that he was entitled to a new trial because, even though his father had consented to the search, the search was constitutionally infirm because the defendant's mother, who was present when the police obtained the father's consent, declined to consent to the search. See *State* v. *Brunetti,* supra, 48–51. Following the release of *Brunetti,* the state filed a motion seeking, inter alia, reconsideration en banc, which we granted.[2] Upon reconsideration, we now conclude that, contrary to our determination in *Brunetti,* the defendant is not entitled to

---

[1] In *Golding,* we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding,* supra, 213 Conn. 239–40.

[2] *Brunetti* was decided by a five member panel of this court consisting of Chief Justice Sullivan and Justices Katz, Palmer, Vertefeuille and Zarella. Upon our granting of the state's motion for reconsideration en banc, Justice Borden and Judge Schaller of the Appellate Court were added to the panel, and they have read the record, briefs and transcript of oral argument. This opinion supersedes our decision in *State* v. *Brunetti,* supra, 276 Conn. 40.

review of his unpreserved constitutional claim because he has failed to establish under the first prong of *Golding*; see footnote 1 of this opinion; that the record is adequate for our review of the merits of his claim. Because we also conclude that the defendant's other claims are without merit,[3] we affirm the judgment of the trial court.

The facts that the jury reasonably could have found are set forth in this court's opinion in *Brunetti*. "On the evening of June 23, 2000, thirty-five year old Doris Crain (victim) left her house and walked to Sonny's Bar on Campbell Avenue in West Haven. After the victim left the bar, she encountered the nineteen year old defendant near the intersection of Campbell Avenue and Main Street. The victim approached the defendant and asked whether he had any marijuana. The defendant replied that he did and asked the victim to smoke with him behind the Washington Avenue Magnet School. After sharing a marijuana cigarette, the defendant and the victim began kissing and engaging in sexual foreplay. After a short time, the defendant and the victim partially removed their clothing, laid on the ground and began engaging in sexual intercourse. After having intercourse for about fifteen minutes, the victim asked

---

[3] In addition to his unpreserved constitutional claim concerning the search of his home, the defendant raises several additional claims, none of which was addressed by the plurality in *Brunetti* in light of its determination that the defendant was entitled to a new trial on the basis of the illegality of the consent search. With respect to the search of his home, the defendant alternatively claims that the search was unlawful because the trial court improperly concluded that the defendant's father knowingly and voluntarily consented to the search. The defendant further contends that the trial court improperly (1) denied his motion to suppress his confession on the ground that the confession was the product of an illegal arrest, (2) permitted the state to adduce testimony concerning the defendant's request for a Bible without first having advised him of his rights, (3) denied the defendant's application for a brief continuance of the trial, and (4) permitted the state to adduce evidence of the defendant's post-*Miranda* silence. We hereinafter address and reject each of these claims.

the defendant to stop because the sexual activity was hurting her. The defendant ignored the victim's request and he continued until he reached an orgasm. After the intercourse ended, the victim got up, cursed at the defendant and told him she was going to call the police. In response to the victim's threat, the defendant grabbed the victim in a chokehold, punched her in the head, dragged her by her hair, and then by her feet, across the ground, and repeatedly struck her over the head with an empty glass bottle.[4] The defendant then left the victim's body in the high grass behind the school, throwing her clothing and the bottle nearby. As he left the school area, the defendant walked past Jerrell Credle, Mike Banores, Jose Rivera and Michael Scott, who were seated at a picnic table on the school grounds. Credle recognized and greeted the defendant. The defendant acknowledged Credle, but did not stop to talk to him or the others, and continued to his home at 208 Center Street, where he lived with his parents.[5]

"Following the discovery of the victim's body the next day, the West Haven police department obtained information suggesting that the defendant might be involved in the victim's murder. [Detective] Anthony Buglione [of the major crime unit of the Connecticut state police] and [Detective] Joseph Biondi [of the West Haven police department] (detectives) went to the defendant's home to question the defendant. The detectives approached the defendant's parents, who were

[4] The defendant inflicted several potentially fatal injuries on the victim, including blunt trauma to the head resulting in bruising to the brain, blunt injury manual strangulation to the neck resulting in fracturing of the hyoid bone, and blunt trauma to the chest and abdomen resulting in fractured ribs and a laceration of the spleen.

[5] Upon the defendant's arrival home at approximately 1:30 a.m., the defendant's father asked him why he had blood on his clothes. The defendant lied, explaining to his father that three men had tried to rob him, that he had punched one of them and that, as a result, he had gotten blood on his clothes.

sitting on the front porch of their home, and asked to speak with the defendant. Anthony Brunetti, Sr., the defendant's father, went inside the house to find the defendant while the detectives remained outside with the defendant's mother, Dawn Brunetti. The defendant emerged from the Brunetti home with his father ten to fifteen minutes later. The detectives then told the defendant that they wanted to bring him to the West Haven police department for questioning and asked him to produce the clothes he had worn the previous evening. The defendant retrieved some clothing from his bedroom, and the detectives then drove the defendant to the police station for questioning. The defendant's parents followed the detectives to the police station in their own car.

"At the police station, the detectives questioned the defendant in an interrogation room, while the defendant's parents remained in the station's waiting area. Sometime during the questioning, Detective James Sweetman of the West Haven police department and [Detective] Mark Testoni [of the Connecticut state police] approached the defendant's parents and asked them to sign a consent form to allow the West Haven police to search the Brunetti residence. The defendant's father signed the form but the defendant's mother refused to sign the form. The defendant's parents then left the police station to let the police into their home to conduct the search while the defendant remained at the station with the detectives. During the search of the home, the police looked inside the washing machine and found several items of recently washed clothing, including a pair of sweatpants, two tank tops and a towel.[6] The sweatpants and towel exhibited 'bleach-like stains,' and one of the tank tops exhibited reddish-brown blood-like stains. When . . . Buglione, who was

---

[6] Forensic examination of this clothing subsequently established that one of the tank tops contained DNA identical to that of the victim.

at the police station questioning the defendant, learned of this discovery, he told the defendant and asked him to elaborate. The defendant then became upset and requested a Bible. The detectives subsequently issued *Miranda*[7] warnings to the defendant, who proceeded to give an inculpatory statement to the detectives, describing in detail the manner in which he had murdered the victim."[8] *State* v. *Brunetti*, supra, 276 Conn. 42–45.

The defendant then was formally placed under arrest and charged with murder. Following a jury trial, the defendant was found guilty and sentenced to a term of imprisonment of sixty years.[9] The defendant subsequently appealed from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b) (3).

On appeal, the defendant claims that the consent search of his home violated his rights under the fourth amendment to the United States constitution[10] and article first, § 7, of the Connecticut constitution[11] because the state failed to obtain the consent of both of his

[7] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] In his confession, the defendant acknowledged that a silver scorpion pendant had fallen off his necklace while he was attacking the victim. That pendant was found in the victim's hair.

[9] The trial court also sentenced the defendant to six months imprisonment after having held him in contempt for physically attacking his attorney, in the courtroom and in the presence of the court, when the jury returned its verdict of guilty. That judgment is not before us in this appeal.

[10] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[11] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

parents. Alternatively, the defendant contends that the search of his home violated the constitutional prohibition against unreasonable searches and seizures because his father's consent to the search was not knowing and voluntary, and, therefore, invalid. The defendant further contends that the trial court improperly: (1) denied his motion to suppress his confession as the product of an illegal arrest; (2) permitted the state to present evidence concerning his request for a Bible in violation of his *Miranda* rights; (3) denied his request for a one day continuance of the trial; and (4) permitted the state to present evidence of his post-*Miranda* silence. We reject all of these claims, which we address in turn.

I

We first address the defendant's claim that, because his mother declined to consent to the search of his home, that search was illegal, and, therefore, evidence seized pursuant to the search, as well as his confession, improperly were admitted into evidence. Because the defendant did not raise this claim at trial, he seeks to prevail under *State* v. *Golding,* supra, 213 Conn. 239–40. The state maintains, inter alia, that the record is inadequate for review of the defendant's unpreserved claim and, therefore, that the claim fails the first prong of *Golding.* We agree with the state.[12]

The following additional factual and procedural background is necessary for our resolution of this claim.[13]

---

[12] The state also contends that neither the federal constitution nor the state constitution required the police to obtain the consent of both of the defendant's parents and, therefore, the father's consent was constitutionally sufficient. We do not reach this issue in view of our conclusion that the record is inadequate for review of the defendant's unpreserved constitutional claim. But see footnote 37 of this opinion (discussing United States Supreme Court's recent decision in *Georgia* v. *Randolph,* 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 [2006]).

[13] We note, preliminarily, that because this opinion addresses the very same claims and reaches the very same conclusions in regard to those claims as the dissent in *State* v. *Brunetti,* supra, 276 Conn. 40, much of the

The defendant filed motions to suppress certain bloody clothing belonging to him that the police had discovered during their search of the home in which he resided, as well as the confession that the defendant had given to the police detailing his attack of the victim. In support of his motions, the defendant claimed, inter alia, that the confession was the product of an illegal search of his home because, he alleged, the police had not obtained valid consent to search the home. The defendant further maintained that his confession was the product of the allegedly unlawful search of his home because he gave his confession after being told of the bloody clothing that the police had discovered during their search of the home. His sole argument in support of that claim was that his father's consent was not voluntary even though his father had signed a form indicating that he "knowingly, willingly and voluntarily" consented to the search "after having been informed of [his] [c]onstitutional right not to have a search performed without a search warrant and of [his] [c]onstitutional right to refuse to consent to such a search . . . ." At no time did the defendant suggest that the state also was required to obtain his mother's consent to search the house, even though the evidence established that the defendant's mother and father were together at the police station, waiting for the defendant, when the police approached them to seek consent to search the family home. In fact, defense counsel expressly advised the court that, although the defendant's mother had declined to sign the consent to search form, the defendant was not claiming that her refusal to do so rendered the search unlawful.

At the suppression hearing, defense counsel adduced testimony from several witnesses,[14] including the defen-

discussion of the defendant's claims is taken verbatim from that dissent. See id., 86–143 (*Palmer, J.*, dissenting).

[14] Although the state bears the burden of establishing the voluntariness of a consent to search; e.g., *State* v. *Cobb*, 251 Conn. 285, 315, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); the

dant's father and mother.[15] Defense counsel sought to establish, inter alia, that the father's consent to search the family home was invalid, notwithstanding the signed consent to search form, because John Brunetti, a detective with the West Haven police department and the brother of the defendant's father, improperly induced the father to agree to the search.[16] On direct examination, the defendant's father testified about the circumstances surrounding his signing of the consent to search form. During his examination of the defendant's father, defense counsel asked: "Okay. And when you were asked to sign that [form]—by the way, was your wife asked to sign it also?" The defendant's father answered: "Yes, they asked if we would sign it, and my wife declined. She did not want to sign it." Following that brief digression regarding the defendant's mother's unwillingness to sign the form, defense counsel resumed his questioning of the defendant's father about what had led him to sign the form.[17] Defense counsel did not ask the defendant's father any further questions regarding the defendant's mother's refusal to sign the form. On cross-examination, the senior assistant state's attorney asked the defendant's father a few questions but none concerning the circumstances surrounding the defendant's mother's refusal to sign the consent to search form.

suppression hearing in the present case commenced with the presentation of evidence by the defendant rather than by the state. The state called no witnesses, relying, instead, on its cross-examination of the defendant's witnesses.

[15] The other witnesses whom the defendant called to testify at the suppression hearing were Detectives Biondi and Sweetman of the West Haven police department, and Detective Buglione of the Connecticut state police. The defendant also testified at the hearing.

[16] As we have indicated, the defendant has raised this claim on appeal. We address this claim in part II of this opinion.

[17] Among other things, the defendant's father indicated that, upon consenting to the search, he and his wife, that is, the defendant's mother, went back to their home to let the police in.

The defendant's mother also testified briefly at the suppression hearing. In response to defense counsel's question regarding whether she signed the consent to search form, the defendant's mother answered, "No, I did not." Defense counsel elicited no other testimony from the defendant's mother regarding the issue of her refusal to sign the form, and the senior assistant state's attorney's brief cross-examination of the mother included no questions on that subject.[18]

The next day, immediately before trial commenced, the court issued a ruling from the bench on the defendant's motions to suppress. After finding that the defendant was in police custody when he was questioned by the investigating officers, the court addressed the defendant's claim that the search of his home was illegal. The court rejected the defendant's claim, concluding that the defendant's father's consent to search was knowing and voluntary, and, therefore, constitutionally valid. During its brief explanation of its ruling on that issue, the court referred to *State* v. *Jones*, 193 Conn. 70, 475 A.2d 1087 (1984), a case upon which the defendant had relied and in which we had explained that the mere acquiescence to a claim of lawful authority by the police is not enough to establish valid consent.[19] *Id.,*

---

[18] The defendant's mother did indicate that she may have offered to make coffee for the police officers while they were conducting the search.

[19] In *Jones*, the defendant, Reginald Jones, was residing with his father and stepmother when he became a suspect in the murder of a teacher at a high school in New Haven. *State* v. *Jones*, supra, 193 Conn. 73, 77. The police executed two separate consent searches of the family home, one predicated on the consent of Jones' father and the other on the consent of his stepmother. Id., 77–78. Jones challenged the voluntariness of each such consent and adduced testimony from his father and stepmother that they had given their consent to search only because the police had led each of them to believe that a warrant inevitably would be issued if they declined to do so. See id., 78. In denying Jones' motion to suppress certain physical evidence, the trial court rejected that testimony, however, crediting, instead, the contrary testimony of certain police officers. See id., 77, 78–79. We concluded that the trial court reasonably had credited the testimony of the state's witnesses and, therefore, rejected Jones' claim on appeal that the trial court improperly had concluded that the searches were lawful. See id., 80–81.

79. Although stating that the present case did not present such a scenario, the court added: "It is clear that at least one of the parties, one of the parents, declined to consent to [the] search."[20]

The case then proceeded to trial. At the conclusion of the trial, the jury found the defendant guilty of mur-

[20] The following is the court's ruling on the defendant's motion to suppress with respect to the issue of whether the consent search was illegal: "Regarding the consent to search, counsel—and I must place on the record that perhaps one reason for the state's . . . [request for an immediate ruling on the suppression issues] was that the [state] had provided me at least a day or so earlier with the applicable case law in every aspect of the issue regarding voluntariness and custody as deemed appropriate for this issue. And the court—and also defense counsel as well provided the court with the case law. This is a courtroom of law. We are confined and operate in accordance with the law.

"Now in [State v. Jones, supra, 193 Conn. 70], cited by [defense counsel] in support of [the defendant's] . . . motion to suppress the evidence in regard to the consent offered by the parents such as it was before the court, the court heard the evidence and indeed ordered the transcripts last night, and they were presented to the court this morning. The court distinguishes this case from [Jones]. It is clear to the court that this is not an issue as decided in [Jones], one of acquiescence to a lawful—to a claim of lawful authority. It is not that. It is clear that at least one of the parties, one of the parents, declined to consent to [the] search.

"This was conducted at the police station. [The defendant's father's] brother is an officer. And, as he did, he sought information, information to decide whether or not he should sign the consent [form]. He sought information to make an informed decision. He made it clear for the record that he knew he did not have to sign it. He made that quite clear. There was no coercion. There was no force. There was no mere acquiescence. He invited comment by his brother, sought his advice, as he should. He's experienced in this area. And based upon that advice, he consented to [the] search.

"There is no issue of whether or not he had authority to consent to the search of the defendant's bedroom, and it's been an issue before [the] court, and that's been satisfied. So, in regard to the search, the court finds that the consent to search was given knowingly and voluntarily. And the court is mindful of the fact that our courts look for warrants, [encourage] the use of warrants when going to persons' homes in our country pursuant to our constitution. This is a matter where the consent to search was given freely . . . [and] voluntarily. It was not a product of coercion, [express] or implied. That motion is denied."

Although the trial court indicated that it would "follow . . . up" its oral ruling with a written memorandum "at the conclusion of the case," the court apparently did not do so.

der,[21] and the trial court rendered judgment in accordance with the jury verdict. The defendant thereupon filed this appeal. During the pendency of the appeal, the defendant filed a motion for articulation with the trial court in which he informed the court that, on appeal, he intended to challenge the propriety of the court's rulings on his suppression motions. In his motion for articulation, the defendant, who then was represented by appellate counsel in lieu of trial counsel, requested that the court "articulate the factual bases of its decision with respect to" five specific questions, including the following: "Did the defendant's mother . . . decline to give her consent for a search of the house?" "Did the trial court credit the testimony of the defendant's father . . . with regard to the circumstances surrounding his signing of the consent to search form?"[22] The state filed an opposition to the defendant's

[21] The defendant testified in his own defense at trial. In that testimony, he disavowed the truth of the detailed confession that he had given to the police on the day following the murder, claiming, instead, that his confession was the product of police threats and intimidation. He further maintained that the victim actually had been killed by four members of a cult known as the "Black Dragon" cult. According to the defendant, on the night of the murder, he met the four men, two of whom testified for the state that they had seen the defendant emerge from the school area where the murder of the victim had been committed. The defendant maintained that the men took him to the victim's body, where the defendant took off his sweatpants. According to the defendant, one of the cult members then "dipped the [defendant's] sweatpants in the [victim's] blood." The defendant explained that, because of the heat, he previously had taken off his tank top and placed it in the pocket of his sweatpants. The defendant put his sweatpants back on and proceeded home, where he told his father that he had gotten blood on himself while attempting to defend against three unidentified assailants who had tried to rob him. The defendant's trial testimony regarding the events surrounding the killing of the victim purported to explain how the victim's blood had found its way onto the defendant's clothing.

[22] The other three questions for which the defendant sought an articulation were: 1. "At what point in time did the police have probable cause to arrest the defendant?" 2. "Did the police seize or obtain clothing and jewelry from the defendant in the early evening hours of June 24, 2000, shortly after they arrived at the defendant's house?" 3. "Were the defendant's parents allowed to talk to the defendant at the police station, while he was being interrogated?"

motion for articulation,[23] and, thereafter, the trial court denied the defendant's motion.

The defendant then filed with this court a motion for review of the trial court's denial of his motion for articulation. For the first time in that motion, the defendant explained that, "[o]n appeal, [appellate] counsel will seek to raise the claim that when two persons with equal authority to consent to a search of a residence, are *both present* when the police seek consent, the 'consent' given by one party should not prevail over the 'refusal' to consent by the other party." (Emphasis in original.) In support of his motion, the defendant candidly conceded not only that the evidence he presented regarding his mother's refusal to consent was "never rebutted or contradicted" by the state, but also that the state's failure to challenge this evidence is insufficient to demonstrate that those facts were admitted or otherwise undisputed by the state. Following the state's submission of its opposition to the defendant's motion for review,[24] this court agreed to entertain the defendant's

---

[23] With respect to the defendant's request for further articulation as to whether the defendant's mother had "decline[d] to give her consent for a search of the house," and as to whether the court had credited the defendant's father's testimony, the state objected to that request, claiming that "[a] trial court's denial of a motion to suppress includes implicit findings that the trial court resolved any factual disputes, including any credibility determinations and any conflicts in testimony, in a manner which supports the trial court's ruling. . . . The defendant will have every opportunity to argue, if he so chooses, that there was *insufficient* evidence of consent presented at the suppression hearing to support the trial court's ruling that the search was consensual. However, assuming [that] the defendant cannot make such an argument because there *is* sufficient evidence to support such a finding, the defendant has failed to demonstrate that it is necessary for the trial court to articulate the specific portions of testimony which were credited and/or discredited in reaching [its] conclusion." (Citations omitted; emphasis in original.)

[24] In its opposition to the defendant's motion for review, the state argued in relevant part: "[A]lthough the defendant now explains more precisely the purpose of his claimed need for an articulation as to the mother's willingness to consent . . . he is making improper use of a motion for articulation to obtain an answer to a factual question which simply cannot be answered on the basis of the testimony presented below. It would, in fact, be clear

motion but denied the relief requested, namely, the issuance of an order requiring the trial court to articulate the bases for certain aspects of its rulings on the defendant's motions to suppress.

With this background in mind, we turn to the applicable legal principles. In *State* v. *Golding*, supra, 213 Conn. 239–40, this court set forth four conditions that a defendant must satisfy before he may prevail, on appeal, on an unpreserved constitutional claim.[25] Because a defendant cannot prevail under *Golding* unless he meets each of those four conditions, an appellate court is free to reject a defendant's unpreserved claim upon determining that any one of those conditions has not been satisfied. See, e.g., *State* v. *Kirk R.*, 271 Conn. 499, 506 n.12, 857 A.2d 908 (2004). Indeed, unless the defendant has satisfied the first *Golding* prong, that is, unless the defendant has demonstrated that the record is adequate for appellate review, the appellate tribunal will not consider the merits of the defendant's claim.

error for the trial court to find that there was sufficient evidence in this record that the defendant's mother refused to consent to the search. The portions of the transcript cited by the defendant do not support this claim. In both instances, the defendant's father and mother merely testified that the mother declined to *sign the consent form* presented to her and that it was the father who signed it. . . . No follow-up questions were asked exploring the reasons for the mother's declination to sign and whether she, in fact, was expressing her lack of consent. Just as a suspect's mere refusal to sign a *Miranda* waiver form is not, by itself, evidence sufficient to undermine a finding that the suspect knowingly and voluntarily agreed to waive his rights and talk to police . . . any finding by the trial court that the mother 'refused to give consent for the search' would be purely speculative in light of the scant record . . . ." (Citations omitted; emphasis in original.) The state further argued that the defendant "should not be permitted to utilize a motion to articulate in a belated attempt to fashion a one-sided record for *Golding* purposes." "Of course, simply obtaining a new finding of fact by way of a motion for articulation does not mean that the record upon which the trial court is being asked to make that new finding is 'adequate' [for *Golding* purposes] if the state was without notice that it should address a particular issue with the witnesses below."

[25] See footnote 1 of this opinion.

See, e.g., *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004) (first and second prongs of *Golding* "involve a determination of whether the claim is reviewable") cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

We note, moreover, that *Golding* is a narrow exception to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court. The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party. E.g., *State* v. *Sandoval*, 263 Conn. 524, 556, 821 A.2d 247 (2003). Nevertheless, because constitutional claims implicate fundamental rights, it also would be unfair automatically and categorically to bar a defendant from raising a meritorious constitutional claim that warrants a new trial solely because the defendant failed to identify the violation at trial. *Golding* strikes an appropriate balance between these competing interests: the defendant may raise such a constitutional claim on appeal, and the appellate tribunal will review it, but only if the trial court record is adequate for appellate review.[26] The reason for this requirement demands no great elaboration: in the absence of a sufficient record, there is no way to know whether a violation of constitutional magnitude in fact has occurred.[27] Thus, as we stated in *Golding*, we will

---

[26] In concluding that appellate review of such a claim is appropriate, this court has noted the exceptional circumstances that warrant that review. See *State* v. *Golding*, supra, 213 Conn. 238–39.

[27] Of course, if the record is inadequate for review, *Golding* prohibits a reviewing court from remanding to the trial court for the purpose of supplementing the record. Indeed, that is what the first prong of *Golding* was designed to avoid. *State* v. *Medina*, 228 Conn. 281, 301, 636 A.2d 351 (1994); *State* v. *Stanley*, 223 Conn. 674, 689–90, 613 A.2d 788 (1992). A contrary rule would promote ceaseless litigation by discouraging parties from raising claims in a timely manner, thereby seriously undermining the efficient administration of justice.

not address an unpreserved constitutional claim "[i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . ." *State* v. *Golding,* supra, 213 Conn. 240.

The defendant contends that the record is adequate for review of his unpreserved claim because, in ruling on the defendant's motion to suppress, the trial court stated, "[i]t is clear that at least one of the parties, one of the parents, declined to consent to [the] search."[28] The defendant contends that this statement perfected the record for review because it "[constituted] a finding, supported by [the] evidence," that the defendant's mother had declined to consent to the search. With respect to his contention that the court's statement was supported by the evidence, the defendant refers to his parents' suppression hearing testimony that the defendant's mother had declined to sign the consent to search form. For the reasons that follow, we disagree with the defendant's assertion that the record is adequate for our review of his claim.

It is beyond dispute that the act of declining to *sign* a consent to search form is not tantamount to a refusal to *consent* to the search; rather, it is simply one of several relevant factors that a court considers in determining the validity of a consent to search. See, e.g., *United States* v. *Lattimore,* 87 F.3d 647, 650–51 (4th Cir. 1996). Because the refusal to sign a consent to search form is one of several factors to be considered in determining the validity of consent, such refusal does not vitiate consent otherwise found to be valid in light of all of the circumstances. See, e.g., *United States* v. *Price,* 54 F.3d 342, 346–47 (7th Cir. 1995); *United States* v. *Thompson,* 876 F.2d 1381, 1384 (8th Cir.), cert. denied,

---

[28] It is undisputed that the trial court was referring to the defendant's mother.

493 U.S. 868, 110 S. Ct. 192, 107 L. Ed. 2d 147 (1989); *United States* v. *Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989); *United States* v. *Boukater*, 409 F.2d 537, 538–39 (5th Cir. 1969); see also *State* v. *Fields*, 31 Conn. App. 312, 325, 624 A.2d 1165 ("a consent to search does not have to be in writing to be valid"), cert. denied, 226 Conn. 916, 628 A.2d 989 (1993). "Whether a [person] voluntarily has consented to a search is a question of fact to be determined by the trial court from the totality of the circumstances based on the evidence that it deems credible along with the reasonable inferences that can be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Nowell*, 262 Conn. 686, 699, 817 A.2d 76 (2003). Thus, "no one factor is controlling" on the issue of voluntariness; (internal quotation marks omitted) *State* v. *Reddick*, 189 Conn. 461, 469, 456 A.2d 1191 (1983); including the fact that the person whose consent to search was sought refused to sign a consent form.[29] See, e.g., *United States* v. *Price*, supra, 347 (upholding validity of consent search notwithstanding defendant's refusal to sign consent to search form); *United States* v. *Thompson*, supra, 1384 (same); *United States* v. *Castillo*, supra, 1082 (same).

It is uncontested that the only evidence adduced at the suppression hearing regarding the position that the defendant's mother had taken with respect to the search was that she declined to sign the consent to search form. Defense counsel, who elicited this testimony, presented no other evidence on the issue. Because the

---

[29] It is equally well established that an accused may be found to have knowingly and voluntarily waived his *Miranda* rights even though he has elected not to sign a waiver form. See, e.g., *North Carolina* v. *Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Harris*, 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983). Similarly, an oral statement or confession will not be deemed to be involuntary merely because an accused has declined to reduce it to writing. E.g., *State* v. *Barrett*, 205 Conn. 437, 450–51, 534 A.2d 219 (1987).

mother's actions relating to the consent to search were not at issue at the suppression hearing—the defendant had claimed only that his father had not given valid consent to search and, in fact, expressly had indicated that the mother's consent was *not* necessary—the state had no reason to present any evidence regarding the mother's consent or lack thereof, and, consequently, it did not do so. As a result, we simply do not know any of the other circumstances surrounding the mother's refusal to sign the consent to search form. Thus, we do not know, because the record does not reveal, whether the defendant's mother (1) declined to sign the form but orally consented to the search, (2) acquiesced in her husband's consent to the search, (3) affirmatively refused to consent to the search, or (4) took some other position regarding the search. All we know is that she did not sign the consent to search form.[30] Consequently, any conclusion regarding the defendant's mother's position concerning the search—other than the fact that she declined to sign the consent to search form—would be purely speculative.[31]

---

[30] In fact, to the extremely limited extent that the record contains any other evidence that may be deemed to bear upon the question of the defendant's mother's consent, that evidence, specifically, the fact that the defendant's father and mother returned home together to let the police in, and the fact that the defendant's mother may have offered coffee to the police during the search of her home; see footnotes 17 and 18 of this opinion; suggests that she may not have opposed the search. This evidence, which was adduced by the parties during the litigation of the defendant's claim regarding the validity of his father's consent, merely underscores the obvious and undisputed fact that a person's refusal to sign a consent to search form is only one of several relevant factors to be considered in determining the broader issue of consent.

[31] The dissenting justices, who conclude that the record is adequate for our review of the defendant's unpreserved constitutional claim for the reasons set forth in Justice Katz' concurring opinion in *State* v. *Brunetti*, supra, 276 Conn. 66–86 (*Katz, J.*, concurring), postulate that the defendant's mother's lack of consent reasonably may be inferred from her refusal to sign the consent to search form. See id., 72 (*Katz, J.*, concurring). This assertion is incorrect. The state did not bear the burden of establishing the defendant's mother's consent because that issue never was before the court. Consequently, the state never had any reason to establish that the mother had

Furthermore, because the defendant's motions to suppress did not implicate the mother's consent or lack thereof, the state was not on notice that it was required to establish, on the basis of the totality of the circumstances, that the defendant's mother had consented to or acquiesced in the search.[32] In such circumstances, the state bears no responsibility for the evidentiary lacunae, and, therefore, it would be manifestly unfair to the state for this court to reach the merits of the defendant's claim upon a mere *assumption* that the defendant's mother had declined to consent to the search.[33]

consented to the search. In such circumstances, it would be improper to infer the mother's lack of consent on the basis of the defendant's mother's refusal to sign the consent to search form because the record is incomplete with respect to the issue of her consent, and that incomplete record is attributable to the defendant's failure to raise the issue in the trial court.

[32] We note that, because defense counsel expressly advised the trial court that the defendant was *not* claiming that both of his parents were required to consent to the search, the defendant's claim to the contrary on appeal has attributes similar to claims that we have rejected under the doctrine of induced error. As we previously have explained, the "term 'induced error,' or 'invited error,' has been defined as '[a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling.' . . . 'It is well established that a party who induces an error cannot be heard to later complain about that error.' " (Citations omitted.) *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004). This principle bars appellate review of induced nonconstitutional error *and* induced constitutional error. See *State* v. *Cruz*, 269 Conn. 97, 106–107, 848 A.2d 445 (2004). For purposes of this case, however, we need not explore the parameters of this principle in light of our conclusion that the record is inadequate for our review of the defendant's claim.

[33] The dissenting justices suggest that the state bears responsibility for the state of the record because the state opposed the defendant's motion for articulation. See *State* v. *Brunetti*, supra, 276 Conn. 74 (*Katz, J.*, concurring). We reject this suggestion. The state was correct in opposing that motion, as we recognized in declining to disturb the trial court's denial of the motion. A motion for articulation is not proper if the movant seeks articulation with respect to an issue that was not raised in the trial court. See Practice Book § 66-5 (articulation appropriate when further facts are necessary for proper presentation, on appeal, of "the issues raised" in trial court); see also *Cable* v. *Bic Corp.*, 270 Conn. 433, 444–45, 854 A.2d 1057 (2004) ("[p]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the

In *State* v. *Medina,* 228 Conn. 281, 636 A.2d 351 (1994), we addressed a claim markedly similar to the claim that the defendant raises in the present case, and our analysis and resolution of the claim in *Medina* is highly relevant to our disposition of the defendant's claim. In *Medina,* we declined to review an unpreserved constitutional claim regarding the alleged involuntariness of the confession of the defendant, Angel Medina, Jr., because the record was inadequate for review. Id., 300–302. In the trial court, Medina filed a motion to suppress his confession on the ground that it had not been made knowingly and voluntarily because he had not been given his *Miranda* warnings. Id., 296–98. For the first time on appeal, he raised a different claim under the state constitution, namely, that his confession was involuntary due to his impaired mental state. See generally id., 293–300. In explaining why the record was insufficient for appellate review of Medina's unpreserved state constitutional claim, we observed that, "because [Medina] did not clearly raise [that] . . . claim in the trial court, the state was not put on notice that it was required to defend against such a claim. Thus, neither the state nor the trial court—nor this court on appeal— had the benefit of a complete factual inquiry into [Medina's] mental condition at the time his statements were made." Id., 300. We further noted that "[t]he trial court never ruled on the issue of the voluntariness of [Medina's] statements under the state constitution because . . . that issue was not properly raised. We do not know, therefore, whether the trial court, after conduct-

---

trial court rendered its decision" [internal quotation marks omitted]). Indeed, to conclude otherwise would lead to the absurdity of requiring a trial court to assist in its own ambuscade by the defendant. In the present case, the record was adequate with respect to the claim that the defendant did raise in the trial court, namely, that the defendant's father's consent was invalid; the inadequacy of the record with respect to the defendant's unpreserved claim derives solely from the fact that the defendant failed to raise that claim in the trial court, and not from any conduct by the state.

ing a full evidentiary hearing and applying the state constitutional standard . . . urged by [Medina], would have found [Medina's] statements to have been involuntary." Id. Precisely the same can be said of the record in the present case. Because the state had no reason to adduce any evidence regarding the mother's role in the consent to search, there was no meaningful factual inquiry into that issue, and, consequently, we have no idea what such an inquiry would have revealed and no idea what the trial court would have found about the mother's consent or lack thereof. Cf. *State* v. *Daniels*, 248 Conn. 64, 80–81, 726 A.2d 520 (1999) (record inadequate to review unpreserved constitutional claim that out-of-court identification violated defendant's due process rights because not all facts relevant to claim were adduced in trial court).[34]

Because there are any number of reasons for the defendant's mother's refusal to execute the consent to search form that are fully consistent with a willingness on her part to allow the police to search the house, and

[34] The dissenting justices assert that, "[b]ecause the defendant was contesting the validity of the father's consent, the state had every incentive to prove under its theory of consent, if it could, that the defendant's mother had acquiesced to the search and, thus, that her refusal to sign the consent form had no import." *State* v. *Brunetti*, supra, 276 Conn. 74 n.5 (*Katz, J.*, concurring). We disagree. The state had no incentive to establish the consent of the defendant's mother because the defendant had challenged only the validity of the consent of the defendant's father, and the defendant's mother's refusal to sign the consent form had no bearing on the validity of the consent given by the defendant's father. Moreover, the state's evidence establishing the defendant's father's consent was overwhelming. The father himself testified that (1) he had reviewed the consent to search form, and the police had explained the form to him, (2) he understood the form, (3) he had been advised by the police that he had the right to refuse to sign the form, (4) no one had forced him to do so, and (5) he voluntarily had signed the form. Other witnesses also testified in support of the state's contention that the defendant's father's consent was knowing and voluntary in all respects. See footnote 15 of this opinion. In light of the defendant's father's testimony alone, however, the state simply had no reason to seek to establish the defendant's mother's consent or acquiescence to the search.

because the state had no obligation or incentive to adduce any evidence regarding the mother's consent or lack thereof, no conclusion—indeed, no inference—reasonably can be drawn from her failure to sign the form. Consequently, the statement that the trial court made in ruling on the defendant's motions to suppress that the defendant's mother had "declined to consent to [the] search" goes well beyond the record. As we have explained, the only evidence regarding the mother's consent or lack thereof was her testimony and the testimony of her husband that she declined to *sign* the consent to search form. Thus, because there was no meaningful factual inquiry into the mother's conduct relative to the consent to search, the evidence in the record was insufficient to allow a determination regarding the mother's consent. In the absence of an evidentiary foundation for the court's statement, it simply was erroneous.[35]

In fairness to the trial court, however, it bears emphasizing that the court issued its brief ruling on the defendant's motions to suppress from the bench, immediately prior to the commencement of trial, and, further, the only claim that the defendant raised in those motions was the purported invalidity of his father's consent to search. Consequently, it is highly likely that the court's passing observation that the defendant's mother had "declined to consent to [the] search" was intended as nothing more than a shorthand reference to the undisputed fact that the state had not established her consent. To conclude otherwise—that is, to conclude that the trial court intended for its statement to constitute a factual finding—would be to presume that the trial

[35] We note, in addition, that the state had no legitimate opportunity to seek to correct the trial court's misstatement, as it was made during a brief oral ruling, and less reason to do so because the court ruled in the state's favor when it *denied* the defendant's motions to suppress in its ruling, and trial proceeded immediately thereafter.

court had reason to be precise about how it character-
ized the role of the defendant's mother in the search;
in fact, the court had no such reason because no legal
issue relating to her involvement in the search was ever
before the court. Thus, we do not believe that the trial
court ever intended that its fleeting comment regarding
the defendant's mother's position vis-á-vis the search
would be elevated to the status of a factual finding.[36]

This court recently has reiterated the fundamental
point that "[i]t is incumbent upon the [defendant] to
take the necessary steps to sustain [his] burden of pro-
viding an adequate record for appellate review. . . .
Our role is not to guess at possibilities . . . but to
review claims based on a complete factual record devel-
oped by a trial court. . . . Without the necessary fac-
tual and legal conclusions furnished by the trial court
. . . any decision made by us respecting [the defen-
dant's claims] would be entirely speculative." (Internal
quotation marks omitted.) *Gordon* v. *H.N.S. Manage-
ment Co.*, 272 Conn. 81, 101, 861 A.2d 1160 (2004). As
we previously have explained, the defendant's mother's
refusal to sign the consent to search form is but one
factor that the court would have been required to con-
sider if the court had been asked to determine whether
she had consented to the search, had acquiesced in the
search or had objected to the search. Because the issue

---

[36] The dissenting justices import significance into the trial court's state-
ment that the defendant's mother had "declined to consent to [the] search"
by asserting that that statement was material to the court's finding regarding
the validity of the defendant's father's consent to search. Specifically, the
dissenting justices refer to the juxtaposition of that statement with the
court's reference to *State* v. *Jones*, supra, 193 Conn. 70. See *State* v. *Brunetti*,
supra, 276 Conn. 71–72 (*Katz, J.*, concurring). This contention is devoid of
merit. The trial court's reference to *Jones* had nothing to do with the defen-
dant's mother's consent or lack thereof. The trial court adverted to *Jones*
solely in reference to the defendant's contention that his father's consent
was invalid because it was based on a claim of lawful authority by the
police, the very argument that we had addressed in *Jones*. See *State* v.
*Jones*, supra, 78–79; see also footnote 19 of this opinion.

of the defendant's mother's consent was not before the court, the facts relevant to the issue of the defendant's mother's consent never were adduced in the trial court. Consequently, the defendant has failed to satisfy the first prong of *Golding* because the facts revealed by the record are inadequate to establish whether the alleged constitutional violation did, in fact, occur. See *State* v. *Golding*, supra, 213 Conn. 240. Accordingly, we decline to review the defendant's unpreserved constitutional claim.[37]

## II

The defendant next claims that the trial court improperly denied his motions to suppress certain bloody clothing belonging to him that the police had discovered during their search of the home in which he resided, as well as the confession that the defendant had given to the police describing in detail the manner in which he had killed the victim. The defendant contends that his confession was the product both of his illegal arrest, which the defendant maintains was unlawful because the state lacked probable cause to

---

[37] Although we do not reach the merits of the defendant's constitutional claim because of the inadequacy of the record, we are compelled to respond to the one substantive point raised by the dissenting justices, namely, that the defendant is entitled to a new trial under the recent decision of the United States Supreme Court in *Georgia* v. *Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). In *Randolph*, however, the United States Supreme Court merely held that, for purposes of the federal constitution, "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable *as to him* on the basis of consent given to the police by another resident." (Emphasis added.) Id., 120. Indeed, *Randolph expressly declined* to decide the very question raised by this appeal, namely, "the constitutionality of . . . a search as to [an absent] *third tenant* against whom the government wishes to use evidence seized after a search with consent from one co-tenant subject to the contemporaneous objection of another." (Emphasis added.) Id., 120 n.8. Consequently, *contrary to the assertion of the dissenting justices, Randolph* does not resolve the issue raised by the defendant's unpreserved constitutional claim.

detain him, and the warrantless search of his home, which the defendant contends was unlawful because his father's consent was involuntary and, therefore, invalid. With respect to the bloody clothes, the defendant claims that they should have been suppressed because his father's consent to the search was involuntary. We reject these claims.

The following facts, which were adduced at the hearing on the defendant's motions to suppress, are necessary to a resolution of these claims. On the morning of Saturday, June 24, 2000, the West Haven police received a report that a dead body had been discovered behind the Washington Avenue Magnet School. Detective Biondi, of the West Haven police department, and John Brunetti, also a detective with that department and the brother of the defendant's father, found the victim's body lying facedown in a wooded area behind the school. Later that day, the police received information that the defendant had been in the vicinity of the crime scene at the time of the victim's murder.[38] Detective Brunetti withdrew from the investigation and was replaced by Detective Buglione of the Connecticut state police.

On the evening of June 24, the detectives went to the residence at 208 Center Street in West Haven where the defendant lived with his parents. The defendant's parents were outside when the detectives arrived. The detectives informed them that they were investigating a homicide, that the defendant had been identified as a possible suspect and that they wanted to know of the defendant's whereabouts on the preceding evening. The defendant's father was cooperative and went inside to

[38] The police received this information about the defendant from Michael Scott, whom the defendant knew as "Big Mike." In his confession, the defendant noted that, as he was leaving the scene of the crime, he saw Scott and several other men seated at a picnic table nearby and exchanged greetings with them.

get the defendant, who emerged from the house with his father about fifteen minutes later. Biondi told the defendant why he and Buglione were there and asked whether the defendant would be willing to accompany them to the police station to answer some questions. According to Biondi, he told the defendant that he did not have to go with them, but the defendant agreed to do so, and the detectives then transported the defendant to the station. According to the defendant, however, he did not believe that he was free to refuse to go to the station with the detectives. The defendant's parents followed the detectives and the defendant to the station, where they planned to wait until the detectives had completed their questioning of the defendant.

Upon arriving at the police station, the detectives took the defendant to a small office in the detective bureau and closed the door. Buglione informed the defendant that they were investigating the murder of a woman whose body had been discovered behind a school. The detectives did not advise the defendant of his *Miranda* rights, but, according to Biondi, he specifically told the defendant that he was free to leave. Biondi further testified that the defendant indicated that he wished to stay and answer the detectives' questions. The defendant testified, however, that he repeatedly had told the detectives that he wanted to leave but that they had informed him that he could not do so.

Buglione asked the defendant where he had been the previous evening. The defendant provided an alibi for the evening, explaining that he had been at a party with a friend. Buglione reduced the defendant's statement to writing but doubted the veracity of the statement in light of the defendant's overall demeanor and his inability to remember certain details regarding the evening's events. The defendant eventually signed the statement.

While the defendant was still at the police station, Detective Testoni of the Connecticut state police

approached the defendant's parents, who were at the station waiting for the defendant, and presented them with a consent to search form for their home. Testoni explained the form, told them that they had a right not to sign it and asked them if they nevertheless would be willing to do so. Detective Brunetti, the defendant's father's brother, was sitting with the defendant's parents when Testoni approached them and requested their consent to search their home. The defendant's father asked Detective Brunetti what could happen if he declined to sign the form, and Detective Brunetti stated that "they could obtain a search warrant and possibly keep you from going back into your home until the search warrant . . . is obtained." In addition, Detective Brunetti told the defendant's father that he would be "better off complying. You know, do the right thing, basically." The defendant's father then read the consent to search form and signed it. According to the defendant's father, he was not forced to sign the form but, rather, did so voluntarily. Upon obtaining the executed consent to search form, Testoni and Detective Sweetman of the West Haven police department went to the defendant's home and searched it. While searching the laundry area of the basement, they found and seized certain evidence, including what appeared to be bloody clothing belonging to the defendant.

Upon learning that Testoni and Sweetman had found bloody clothing in the laundry area of the defendant's home, Buglione informed the defendant of the discovery and told the defendant that he, Buglione, had a "problem" with the veracity of the statement that the defendant had provided. The defendant started to cry and asked for a Bible. Buglione left the room to find a Bible but, unable to locate one, soon returned to the interview room. Upon his return, Buglione read the defendant his *Miranda* rights from a state police waiver form. The defendant initialed each warning and signed

the waiver form indicating that he had been advised of his constitutional rights and that he wished to waive them and to speak to the police. The defendant then admitted that he had killed the victim, explaining in detail why and how he had done so.[39] Buglione transcribed the defendant's statement, which the defendant signed. The defendant then formally was placed under arrest and charged with the victim's murder.

On the basis of the foregoing evidence, the trial court concluded that the detectives took the defendant into custody when they transported him to the police station and that he remained in their custody at all relevant times thereafter.[40] The trial court also concluded, however, that the defendant had been given *Miranda* warnings before he gave the police his second, inculpatory statement. The court further found that the defendant understood his rights and knowingly and intentionally waived them when he provided the police with that second statement. With respect to the defendant's father's consent to search, the court found that that consent was knowing and voluntary, and, therefore, valid. See footnote 20 of this opinion. The court expressly rejected the defendant's claim that the consent was invalid because of what Detective Brunetti had

---

[39] Among other things, the defendant explained that he had decided to kill the victim when she told him that she intended to tell the police that he had continued to engage in sexual intercourse with her despite her insistence that he stop. In particular, the defendant, who already was on probation stemming from his conviction for a felony drug offense, stated that he "did not want to go back to jail."

[40] In light of the trial court's conclusion that the defendant was in custody when he gave his first statement, and because the state conceded that the defendant had not been advised of his *Miranda* rights prior to that statement, the trial court granted the defendant's motion to suppress that initial statement. Although the state does not concede that the trial court properly found that the defendant was in custody at that time, the state nevertheless has not challenged that finding on appeal. Consequently, the propriety of the court's ruling with respect to the defendant's motion to suppress his first statement is not the subject of this appeal.

told the defendant's father in response to the father's inquiry of Detective Brunetti about what could happen if he elected not to sign the consent to search form.

With this background in mind, we turn to the merits of the defendant's claims that the trial court improperly denied his motions to suppress his confession and the clothing seized from his home. In view of the fact that both claims hinge, more or less, on the defendant's contention that the search of his home was unlawful due to the alleged invalidity of his father's consent to search, we address that issue first.

"Under both the fourth amendment to the federal constitution and article first, § 7, of the state constitution, a warrantless search of a home is presumptively unreasonable. E.g., *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Gant*, 231 Conn. 43, 63 and n.15, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). A search is not unreasonable, however, if a person with authority to do so has voluntarily consented to the search. E.g., *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 242–43, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State* v. *Cobb*, 251 Conn. 285, 314, 743 A.2d 1 (1999) . . . cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Reagan*, 209 Conn. 1, 7, 546 A.2d 839 (1988). The state bears the burden of proving that the consent was free and voluntary and that the person who purported to consent had the authority to do so. . . . *State* v. *Reagan*, supra, 7. The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. *State* v. *Jones*, [supra, 193 Conn. 79]. The question [of] whether consent to a search has . . . been freely and voluntarily given, or was the product of coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances . . . *State* v.

*Reagan,* supra, 7–8; and, ultimately, requires a determination regarding the putative consenter's state of mind. *Poulos* v. *Pfizer, Inc.,* 244 Conn. 598, 609, 711 A.2d 688 (1998)." (Internal quotation marks omitted.) *State* v. *Reynolds,* 264 Conn. 1, 43–44, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

For purposes of this claim only, the defendant does not dispute that his father had authority to consent to the search of his home. The defendant also acknowledges that the record establishes that the police explained the consent to search form to the defendant's father, that he was advised that he had the right not to sign it, that he understood that right, and that no one forced him to sign it. The defendant claims, rather, that his father's consent was not voluntary "in the constitutional sense" because his father was "led to believe that withholding consent would be a futile act." The defendant's claim is predicated on the fact that his father's brother, Detective Brunetti, in response to an inquiry by the defendant's father about the consent to search, stated that the police "could obtain a search warrant and possibly keep [him] from going back into [his] home until the search warrant . . . [was] obtained."

It is true that, if the police had instructed the defendant's father that they *would* obtain a search warrant if he had refused to give consent, then such consent would have been involuntary, for constitutional purposes, because "the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant." *Dotson* v. *Warden,* 175 Conn. 614, 621, 402 A.2d 790 (1978). In the present case, however, Detective Brunetti informed the defendant's father not that the police *would* obtain a warrant but, rather, that they "could," or *might,* obtain a warrant. This information was neither misleading nor

inherently coercive,[41] and, consequently, the defendant cannot prevail on his claim that his father's consent was the product of improper police coercion. Accordingly, the defendant also cannot prevail on his claim that the trial court improperly denied his motion to suppress the bloody clothes that the police had discovered during their search of the defendant's home.

The defendant next contends that the trial court improperly denied his motion to suppress his confession. The defendant's claim is predicated on the assertion that his confession was the product both of his illegal arrest and the illegal search of his home. With respect to the former, the defendant contends that he was taken into police custody, without probable cause, when he was transported to the police station by Biondi and Buglione. With respect to the latter, the defendant contends that the police used the poisonous fruit of the illegal search, namely, the bloody clothing that the police had discovered, to induce him to confess. Insofar as the defendant's claim is based on the allegedly illegal search of his home, we already have explained that the search was lawful, and, therefore, the seizure of the bloody clothing also was lawful. Thus, the detectives' confrontation of the defendant with the fact that they had discovered the bloody clothing was not itself improper. We turn, therefore, to the defendant's claim insofar as it relates to his allegedly illegal arrest.

The trial court concluded, and for purposes of this appeal the state does not dispute, that the defendant was in police custody when he arrived at the police

---

[41] The same is true with respect to Detective Brunetti's further comment that the police "possibly" could bar the defendant's parents from entering their home if the decision was made to seek a search warrant. That comment was an accurate representation of standard police practice, and it carried no suggestion that the defendant's father's refusal to consent to a search of the home automatically would result in a bar to the defendant's parents' reentry.

station. Because the police lacked probable cause to arrest the defendant at that time, the state acknowledges that "the trial court implicitly found that the defendant's initial confinement was illegal." For purposes of this appeal, the state also does not challenge that conclusion. Rather, the state contends that the nexus between the defendant's unlawful arrest and the confession that the police obtained from him while he was in their custody was sufficiently attenuated to warrant the state's use of the confession. We agree with the state.[42]

"As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the fourth amendment to the United States constitution. See *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). [T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures. *United States* v. *Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). To carry out this purpose adequately, the rule does not distinguish between physical and verbal evidence; see *Wong Sun* v. *United States*, supra, 485–86; nor does it apply only to evidence obtained as a direct result of the unlawful activity. See *Nardone* v. *United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939). Rather, the rule extends to evidence that is merely derivative of the unlawful conduct, or what is known as the fruit of the poisonous tree. See id. The application of the rule, however, is restricted to those situations [in which] its objectives are most efficaciously served. *United States* v. *Calandra*, supra, 348. Limiting the rule's application recognizes that in some circumstances strict

---

[42] The trial court did not explicitly address the state's claim of attenuation. Both parties expressly agree, however, that the record nevertheless is fully adequate for our resolution of that issue on appeal.

adherence to the . . . rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes. *Brown* v. *Illinois*, 422 U.S. 590, 608–609, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring). Thus, evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint . . . . *Segura* v. *United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 189, 811 A.2d 223 (2002). In other words, "the question to be resolved concerning the admissibility of derivative evidence is whether, granting establishment of the primary illegality, the evidence to which the objection is made has been come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Internal quotation marks omitted.) *State* v. *Blackman*, 246 Conn. 547, 556, 716 A.2d 101 (1998). The factors to be considered in determining whether the statement of an accused is sufficiently attenuated from the original illegality to cleanse it of its taint are (1) whether *Miranda* warnings had been issued, (2) the temporal proximity of the illegal police action and the statement, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. *State* v. *Luurtsema*, supra, 191–92; see also *State* v. *Colvin*, 241 Conn. 650, 654, 697 A.2d 1122 (1997).

In the present case, although we agree with the defendant's assertion that "there was a close temporal sequence" between the defendant's first and second statements to the police, specifically, approximately thirty minutes, we conclude that, in light of all the factors to be considered, the defendant's confession was sufficiently attenuated from his unlawful arrest to purge any taint that flowed from that arrest. With

respect to the threshold consideration of voluntariness, although Buglione confronted the defendant with the discovery of the bloody clothing about one-half hour after the defendant had made his first statement, the defendant was given *Miranda* warnings before he agreed to provide the police with a second statement. It is true, of course, that the state cannot rely on *Miranda* warnings alone to establish that the initial illegality was sufficiently attenuated, but such warnings "are an important factor . . . in determining whether the confession is obtained by exploitation of an illegal arrest." *Brown* v. *Illinois*, supra, 422 U.S. 603. Moreover, the defendant expressly waived his *Miranda* rights in writing prior to giving his second statement, and the trial court found that the defendant had given that statement knowingly and voluntarily.

In addition, the discovery of the bloody clothing at the defendant's home was a significant intervening circumstance. The discovery of that clothing by the police, together with the information that the police already had placing the defendant at or near the scene of the murder at or around the time that it was committed, likely constituted probable cause to implicate the defendant in the victim's death. Although "[t]he intervening discovery of probable cause to support a suspect's detention, by itself, 'cannot assure in every case that the Fourth Amendment violation has not been unduly exploited' "; *United States* v. *Cherry*, 759 F.2d 1196, 1212 (5th Cir. 1985), quoting *Brown* v. *Illinois*, supra, 422 U.S. 603; "the intervening acquisition of probable cause is an important attenuating factor in the analysis." *United States* v. *Cherry*, supra, 1212; see also *Oliver* v. *United States*, 656 A.2d 1159, 1172 n.22 (D.C. App. 1995) ("[m]any courts have found that the acquisition of probable cause through independent means is a powerful factor to purge the taint of an earlier arrest").

Irrespective of whether the discovery of the bloody clothing gave rise to probable cause, the discovery itself constituted a significant intervening factor that tended to purge the taint of the underlying illegality. See, e.g., *People* v. *White*, 117 Ill. 2d 194, 224–25, 512 N.E.2d 677 (1987) (confrontation with untainted evidence may be legitimate intervening circumstance that induces voluntary desire to confess), cert. denied, 485 U.S. 1006, 108 S. Ct. 1469, 99 L. Ed. 2d 698 (1988). Although the defendant had given a statement to the police prior to being confronted with the discovery of the clothing, that statement was exculpatory in nature. When informed of the bloody clothing, however, the defendant confessed to the murder and described it in detail. In such circumstances, it is apparent that the incriminating statement was induced primarily by the lawful discovery of the damaging, untainted evidence and not by the initial, unlawful detention. See, e.g., *State* v. *Stevens*, 574 So. 2d 197, 204 (Fla. App. 1991); *Thorson* v. *State*, 653 So. 2d 876, 886 (Miss. 1994); *State* v. *Tobias*, 196 Wis. 2d 537, 550–51, 538 N.W.2d 843 (App. 1995).

The final consideration, namely, the purpose and flagrancy of the official misconduct, also militates decisively in favor of a finding of attenuation. Although the conduct of the detectives was purposeful in the sense that they brought the defendant to the police station to question him, their conduct was neither flagrantly in violation of the defendant's rights nor otherwise unduly intimidating or coercive. First, the record indicates that the detectives themselves did not believe that the defendant was under arrest when he accompanied them to the police station. Although the trial court concluded that the defendant reasonably did not believe that he was free to leave the station once he arrived there, the record also would have supported a contrary conclusion regarding the objective reasonableness of the defendant's belief that he was in custody from the time

that he accompanied the police to the station. Furthermore, the defendant's father encouraged the defendant to speak with the police, and the defendant's mother and father followed the defendant to the station and remained there while the police interviewed him. In addition, the suppression hearing testimony is devoid of any indication that the detectives threatened or otherwise attempted to intimidate the defendant, by show of force, or in any other way.[43]

Upon consideration of all of the relevant factors, we conclude that the defendant's confession was sufficiently attenuated from the initial illegality such that the confession reasonably cannot be characterized as the product of that illegality.[44] The defendant's claim

---

[43] At the suppression hearing, the defendant did not indicate that the police had threatened him while he was at the police station. At trial, however, the defendant testified that the police had told him that he was "fucked," and that, unless he cooperated, he would spend the rest of his life in prison. According to the defendant, the police also told him that, if he cooperated, he would be charged with manslaughter and "probably [would] do ten years."

[44] The defendant relies on *Brown* v. *Illinois*, supra, 422 U.S. 590, and *Dunaway* v. *New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979), in support of his contention that his confession was the product of his first statement, which, for purposes of this appeal, the state concedes was the inadmissible fruit of the defendant's unlawful arrest. This claim lacks merit. *Brown* and *Dunaway* each involved factual scenarios in which the petitioner, after being arrested illegally, gave two statements to the police, *both of which* were incriminating. *Dunaway* v. *New York*, supra, 203–204; *Brown* v. *Illinois*, supra, 591, 594–95. In each case, the prosecution claimed that the second statement was admissible, and, in each case, the United States Supreme Court disagreed, concluding that the second statement was "the result and the fruit of the first." *Brown* v. *Illinois*, supra, 605; accord *Dunaway* v. *New York*, supra, 218 n.20. In the circumstances presented by *Brown* and *Dunaway*, the state has a heavy burden of establishing that the second statement is not the product of the first because a defendant who gives one incriminating statement is likely to believe that he has little to lose by giving a second such statement. In contrast to the statements in *Brown* and *Dunaway*, however, the defendant's first statement in the present case was *exculpatory*, and, consequently, any relationship between that statement and the confession that followed necessarily was significantly less direct than that of the statements at issue in *Brown* and *Dunaway*.

that his confession must be suppressed as the fruit of his illegal detention therefore is without merit.

### III

The defendant next contends that it was improper for the state to have adduced Detective Buglione's testimony that the defendant asked for a Bible after being told of the discovery of the bloody clothing at his home.[45] Specifically, the defendant claims that the state used that testimony in violation of his *Miranda* rights because (1) he was in custody when he asked for the Bible, (2) the remark was made in response to questioning by the police, and (3) he had not been given *Miranda* warnings prior to making the remark. It is not necessary to reach the merits of the defendant's claim because, even if the admission of the challenged testimony was improper, it was harmless beyond a reasonable doubt.

"Two conditions . . . give rise to the requirement of advice of rights under *Miranda*: (1) the suspect must be in the custody of law enforcement officials; and (2) the suspect must be subjected to interrogation." *State v. Medina,* supra, 228 Conn. 289. As we explained previously, the state does not challenge on appeal the trial court's finding that the defendant was in custody when he asked for a Bible. With respect to the second requirement, " '[t]he term "interrogation" under *Miranda* is not limited to questioning explicitly designed to elicit an incriminating response but extends to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect. The police, however, cannot be held accountable for the unforeseeable results of their words or actions.' " Id., 290. Even if we assume,

---

[45] The record indicates that the defendant did not preserve this claim in the trial court. Nevertheless, the record is adequate for our review of the claim.

arguendo, that Buglione's statement informing the defendant of the discovery of the bloody clothing at his home constituted interrogation within the meaning of the second *Miranda* requirement, the state's use of the defendant's remark was harmless beyond a reasonable doubt. "The improper admission of a confession is harmless error [when] it can be said beyond a reasonable doubt that the confession did not contribute to the conviction." *State* v. *Hafford*, 252 Conn. 274, 297, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). In the present case, the evidence against the defendant was overwhelming: the defendant was seen in close proximity to the crime scene at the time of the victim's murder, the victim's blood was found on the defendant's clothing, the defendant provided a detailed confession explaining how and why he had murdered the victim, a part of the defendant's necklace was found in the victim's hair and the defendant sought to cover up the crime by lying to his father about the source of the blood on his clothing. Under the circumstances, any impropriety in the state's use of the challenged evidence was harmless beyond a reasonable doubt.

IV

The defendant also claims that the trial court improperly denied his request, which he made near the close of the evidentiary portion of the trial, for a one day continuance of the trial. This claim also lacks merit.

The following additional facts are relevant to this claim. At trial, the defendant testified that he did not murder the victim. He explained, rather, that, at approximately 1 a.m. on June 24, 2000, he went to the area of the Washington Avenue Magnet School to meet Jerrell Credle. When the defendant arrived, Credle was there, along with Michael Banores, Jose Rivera and Michael Scott. According to the defendant, Credle and the three

other men took him to a wooded area behind the school and showed him the victim's body. At that time, the defendant removed his sweatpants and handed them to Credle, who dipped the pants in the victim's blood. The men then returned to the immediate area of the school and smoked marijuana.

On March 7, 2002, prior to the conclusion of the defendant's trial testimony, defense counsel made an offer of proof outside the presence of the jury. In connection with that offer of proof, the defendant testified that, at the time Credle and the others brought the defendant to the victim's body, Credle bragged about killing the victim and explained how he had done so. The defendant also testified that Credle had "recited some kind of blessing or prayer in the name of the god 'Mambay,' saying that the blood of the sacrifice is acceptable . . . ." The trial court sustained the state's objection to the proffered testimony on hearsay grounds, concluding that Credle's statements did not fall within the hearsay exception for statements against penal interest. In explaining its ruling, the court stated, inter alia, that the statements lacked trustworthiness because, although both Scott and Rivera had testified at trial and were present when Credle allegedly had bragged about killing the victim, defense counsel elected not to examine them about Credle's purported incriminating statements. Defense counsel informed the court that he was attempting to locate Credle to subpoena him, and that his inability to introduce Credle's hearsay statements would infringe unduly on the defendant's right to present a defense. At defense counsel's request, the court recessed at 3:30 p.m. that day to give defense counsel time to provide the court with precedent supporting his contention regarding the admissibility of the proffered testimony.

Trial resumed the following day, March 8, 2002, a Friday. Defense counsel did not provide the court with

any law concerning the admissibility of the proffered hearsay testimony. Instead, the defendant requested a continuance until Monday, March 11, 2002, so that defense counsel could continue his efforts to locate Credle.[46] Defense counsel further explained that the defendant would complete his testimony that day, that there was a "good possibility" that he would have Credle available to testify on Monday, and that Credle would be the last defense witness. Defense counsel also noted that the trial actually had proceeded more quickly than he had expected. The trial court denied both the defendant's request for a continuance and the request to present the proffered evidence. The court again explained that it was denying the request for a continuance on the basis of defense counsel's failure to elicit testimony from either Scott or Rivera regarding Credle's alleged admissions. The court also noted the length of time that the charges had been pending against the defendant and the belated nature of the defendant's request.

"It is well settled that [t]he determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives. . . . Therefore, on appeal, we . . . must determine whether the trial court's decision denying

---

[46] According to defense counsel, he had sought to subpoena Credle earlier in the week by attempting to subpoena him at an address in West Haven. Those efforts were unsuccessful because Credle apparently had moved. Defense counsel noted that he had obtained a New Haven address for Credle, which the state indicated was consistent with the information that it had regarding Credle's whereabouts. Moreover, both the state and the defendant indicated that Credle recently had been arrested.

the request for a continuance was arbitrary or unreason-abl[e]." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 261 Conn. 708, 711, 805 A.2d 705 (2002).

"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to [constitute a constitutional violation]. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . . We have identified several factors that a trial court may consider when exercising its discretion in granting or denying a motion for contin-uance. . . . These factors include the likely length of the delay . . . the impact of delay on the litigants, wit-nesses, opposing counsel and the court . . . the per-ceived legitimacy of the reasons proffered in support of the request . . . [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . ." (Citations omitted; internal quo-tation marks omitted.) Id., 714.

Under the circumstances, and with due regard for the broad leeway possessed by trial courts to grant or to deny continuances, it cannot be said that the court abused its discretion in denying the defendant's request for a continuance. Although it is true that the length of the continuance that the defendant requested was relatively short and the trial apparently was on or ahead of schedule, the court nevertheless was under no obliga-tion to grant the request. As the trial court noted, defense counsel had known for a long time that Credle was likely to be a defense witness, yet the record is devoid of any indication that he took any action to locate Credle until very near the end of the trial.[47] Fur-

---

[47] The defendant suggests that defense counsel's failure to attempt to locate Credle was due to the fact that Credle had been identified as a possible state's witness. That fact alone does not help the defendant because the state had identified Credle as a *potential* witness only. In view of the fact that neither the state nor the defense was obligated to call any witness

thermore, at defense counsel's request, the court recessed early on Thursday, thereby affording defense counsel at least some additional time to locate Credle. Finally, the defendant's claim of a violation of his right to present a defense is undermined by defense counsel's failure to question either Scott or Rivera in connection with the defendant's third party culpability defense. For all the foregoing reasons, the trial court's denial of the defendant's eleventh hour request for a continuance was not unreasonable.

V

The defendant finally claims that the trial court improperly permitted the state to question the defendant about his post-*Miranda* silence. Although we agree with the defendant that the trial court should not have allowed the state to adduce the challenged testimony, we conclude that the impropriety was harmless beyond a reasonable doubt.

As we have indicated, the defendant testified in his own defense and denied that he had anything to do with the victim's murder. With respect to the victim's blood that was found on his clothing, the defendant explained, for the first time at trial, that Jerrell Credle had led him to the victim's body. At that time, the defendant removed his sweatpants, which Credle dipped in the victim's blood and then returned to the defendant, who put them back on. According to the defendant, the victim's blood had found its way onto the defendant's tank top because the defendant previously had removed the tank top and placed it in a pocket of his sweatpants. The defendant further testified that the tank top was in the pocket of his

so identified, defense counsel's failure to subpoena or otherwise to locate Credle cannot be excused merely because Credle appeared on the state's witness list.

sweatpants when Credle dipped them in the victim's blood.

At trial, the senior assistant state's attorney (state's attorney) asked the defendant, "[O]ther than your lawyer, could you please tell . . . the jury when is the first time that you told someone in authority, like a judge, a prosecutor or a police officer, this story about your sweatpants being dipped in blood?" Defense counsel objected to the state's attorney's question, and the trial court overruled the objection. After the state's attorney repeated the question, the defendant responded that he had provided that version of the events for the first time "in this courtroom." The state's attorney then asked the defendant, "Now . . . you say the first time that you said this was in this courtroom. When in this courtroom was the first time this was said?" Defense counsel again objected, claiming that the question violated the defendant's right to remain silent after having been advised of that right in accordance with *Miranda*. The trial court again overruled defense counsel's objection. The defendant then answered, "It was yesterday."

In *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the United States Supreme Court held that "the use for impeachment purposes of a [defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." Id., 619. Under *Miranda*, a suspect who is in custody must be advised, prior to police interrogation, of certain rights, including the right to remain silent and that anything he says may be used against him. *Miranda* v. *Arizona*, 384 U.S. 436, 467–69, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle* v. *Ohio*, supra, 617. In other words,

" '[such] silence . . . is "insolubly ambiguous" be-
cause it may constitute a reliance upon those rights
rather than a tacit admission that the accused has an
insufficient defense or explanation for his conduct.' "
*State* v. *Canty*, 223 Conn. 703, 710, 613 A.2d 1287 (1992).
Moreover, "while it is true that the *Miranda* warnings
contain no express assurance that silence will carry no
penalty, such assurance is implicit to any person who
receives the warnings. In such circumstances, it would
be fundamentally unfair and a deprivation of due pro-
cess to allow the arrested person's silence to be used to
impeach an explanation subsequently offered at trial."
(Internal quotation marks omitted.) *State* v. *Montgom-
ery*, 254 Conn. 694, 712–13, 759 A.2d 995 (2000). When,
however, a defendant who has been given *Miranda*
warnings elects to waive his right to remain silent and
provides the police with a statement, *Doyle* generally
does not apply. See, e.g., id., 716 n.30. "[I]n such circum-
stances, it is permissible to cross-examine a defendant
about details that he or she may have omitted from
responses to police questioning because the defendant,
having agreed to speak with police about the subject
matter of the crime, cannot later complain that he had
failed to mention those details in the exercise of his
fifth amendment right to remain silent." Id., 716–17 n.30.

Like most other constitutional violations, "*Doyle* vio-
lations are . . . subject to harmless error analysis."
(Internal quotation marks omitted.) Id., 717. "A *Doyle*
violation may, in a particular case, be so insignificant
that it is clear beyond a reasonable doubt that the jury
would have returned a guilty verdict without the imper-
missible question or comment upon a defendant's
silence following a *Miranda* warning. Under such cir-
cumstances, the state's use of a defendant's [post-
arrest] silence does not constitute reversible error. . . .
The [error] has similarly been [found to be harmless
when] a prosecutor does not focus upon or highlight

the defendant's silence in his cross-examination and closing remarks and whe[n] the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases [in which] the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) Id., 718.

The state contends that *Doyle* is inapplicable because the defendant did not elect to exercise his right to remain silent after being advised of his *Miranda* rights but, rather, provided the police with a detailed confession. In *State* v. *Silano*, 204 Conn. 769, 778–84, 529 A.2d 1283 (1987), however, this court considered and rejected an argument by the state that *Doyle* is inapplicable in circumstances that were identical in all material respects to those of the present case. We explained: "The state may impeach a defendant by cross-examination concerning a prior inconsistent statement made after arrest and the giving of *Miranda* warnings, even though such impeachment may call into question a defendant's silence about the truth when he made that prior inconsistent statement. . . . Such an examination is allowed because it is impossible to bifurcate a prosecutor's questions concerning inconsistency into those relating to facts contained in a prior statement and those concerning facts omitted therefrom. . . . A prosecutor may not, however, question a defendant about his silence after the interrogation has ceased, since a defendant may reassert his right to remain silent at any time, and if he ceases to answer questions, or to come forward with additional or correcting information after questions are no longer being asked of him, there is a reasonable possibility that he is relying upon that right. . . . [T]herefore . . . [a prosecutor's] question

concerning the defendant's failure *ever again to contact the police [to explain that the defendant's story was untrue], after he [has] been arrested and given a Miranda warning, [is] improper under the strictures of Doyle.*"[48] (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 780–81. Thus, contrary to the state's contention, it was improper for the state's attorney in the present case to question the defendant regarding his failure to have contacted "a judge, a prosecutor or a police officer," after the police interrogation had ceased, for the purpose of correcting his story.

As in *Silano*, however, the *Doyle* violation in the present case was harmless. The improper questioning was relatively brief, and the state's attorney's closing argument contained no reference to the fact that the defendant had not contacted the authorities to correct his story.[49] Furthermore, as we have explained, the evidence against the defendant was overwhelming, and the defendant's version of the events surrounding the victim's murder was "transparently frivolous . . . ." (Internal quotation marks omitted.) Id., 781. Under the circumstances, therefore, there is no reasonable possibility that the state's attorney's improper questions had any bearing on the jury's guilty verdict.

The judgment of the trial court is affirmed.

In this opinion BORDEN, ZARELLA and SCHALLER, Js., concurred.

---

[48] In *Silano*, we nevertheless concluded that the *Doyle* violation was harmless. *State* v. *Silano*, supra, 204 Conn. 782, 784.

[49] The defendant asserts that, on four occasions during closing argument, the state's attorney underscored the defendant's failure to contact the authorities to correct his story. A careful review of the record, however, reveals that the comments on which the defendant relies pertained only to the patent inconsistencies between the confession that the defendant had given to police and his exculpatory trial testimony. That argument was proper because, as we explained previously, the state is free to impeach a defendant with such inconsistencies. See, e.g., *State* v. *Silano*, supra, 204 Conn. 780–81.

KATZ, J., with whom SULLIVAN, C. J., and VERTE-FEUILLE, J., join, dissenting. Previously, in my concurring opinion in *State* v. *Brunetti*, 276 Conn. 40, 82–83, 883 A.2d 1167 (2005), I concluded that the defendant should prevail, under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), on his unpreserved claim[1] that the search of his home was illegal under the federal constitution. Specifically, I decided that, under the federal constitution, a consent to search given by one co-occupant is invalid when another occupant on the scene has refused to consent. *State* v. *Brunetti*, supra, 82 (*Katz, J.*, concurring). I explained that I was unpersuaded by the reasoning of those courts sanctioning consent searches even when a co-occupant is present and objecting because they had invoked the third party consent doctrine from *United States* v. *Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974), "without properly considering a significant distinction in that case—that the nonconsenting co-occupant was *absent*, albeit involuntarily, and thereby assumed the risk of the search. . . . I [was] persuaded . . . that the person whose property is the object of a search should have controlling authority to refuse consent. . . . Though a joint occupant should have authority to consent to a search of jointly held premises if the other party is unavailable, a present, objecting party should not have his constitutional rights ignored because of a leasehold or other property interest shared with another. . . . In other words, the ability to control access to one's home should not be subordinated to a co-occupant *when one remains on the premises and is able to object to access by others*. Therefore, when the police have obtained consent to search from an individual possessing control over the premises, that

---

[1] For all of the reasons I previously articulated in my concurring opinion in *State* v. *Brunetti*, supra, 276 Conn. 68–74, I would conclude that the record is adequate for appellate review of the defendant's unpreserved claim regarding the constitutionality of the search of his home.

consent remains valid against a co-occupant only while the co-occupant is absent. If, however, the co-occupant should be present and objects, the police must obtain a warrant. Any other rule truly would [exalt] expediency over an individual's [f]ourth [a]mendment guarante[e]s." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Brunetti*, supra, 82–83.

The United States Supreme Court thereafter decided *Georgia* v. *Randolph*, 547 U.S. 103, 136, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006), specifically holding that, "[a] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident[2] cannot be justified as reasonable as to him on the basis of consent given to the police by another resident."[3] (Internal quotation marks omitted.) Consistent with this decision, I reaffirm my view that the express denial of consent in this case by the mother of the defendant, Nicholas Brunetti, rendered the search illegal[4] and, accordingly, that the clothing seized from the defendant's family's home should have been sup-

[2] The majority in *Georgia* v. *Randolph*, supra, 547 U.S. 121–22, drew a distinction from the facts in the case before it and a case in which there exists a *potential* objector nearby, who has not been invited to take part in the threshold colloquy: "So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it. . . . [W]e think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received."

[3] The *Randolph* majority rejected the dissent's contention that the court's holding would impair the capacity of the police to protect domestic violence victims, noting that the right of the police to protect such a victim was a distinct issue altogether from the conflicting consent issue. *Georgia* v. *Randolph*, supra, 547 U.S. 118.

[4] As stated in both the *Brunetti* plurality opinion and my concurring opinion, I note that, "by demonstrating his own legitimate expectation of

pressed. Additionally, because the seizure of the defendant's clothing cannot serve as a significant intervening circumstance to cut off any causal connection between the initial illegal seizure and the defendant's confession, its suppression is also required. See *State* v. *Northrop*, 213 Conn. 405, 413, 568 A.2d 439 (1990) ("[i]t is well established that statements obtained through custodial interrogation following the seizure of a person without probable cause, in violation of the fourth amendment, should be excluded unless intervening events break the causal connection between the arrest and the confession"). Accordingly, I would reverse the defendant's judgment of conviction.

VERTEFEUILLE, J., with whom, SULLIVAN, C. J., joins, dissenting. I join Justice Katz' dissent because the United States Supreme Court recently concluded in *Georgia* v. *Randolph*, 547 U.S. 103, 136, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006), that under the federal constitution, an alleged consent to the search of a home conducted in the face of an objection from a joint occu-

privacy and challenging the search based on his mother's refusal to consent, the defendant is not vicariously asserting his mother's constitutional rights, but, rather, is vindicating his own." *State* v. *Brunetti*, supra, 276 Conn. 45–46 n.4; id., 83 (*Katz, J.*, concurring). I am mindful that, in a footnote in *Randolph*, specifically in response to Chief Justice Roberts' dissenting opinion, the majority stated that it had not addressed the issue of the constitutionality of a search as to an absent third co-occupant when there were conflicting responses from two present co-occupants, as in the case presently before this court, because it was "decid[ing] the case before us, not a different one." *Georgia* v. *Randolph*, supra, 547 U.S. 120 n.8. I ascribe no particular significance to this comment, however, other than the majority's recognition that fourth amendment jurisprudence is fact bound, especially as to reasonable expectations of privacy. To the extent that the majority's statement has any significance beyond that, I read it to suggest that the majority disagrees with Chief Justice Roberts' statement that the majority's rule necessarily "implies entry and search would be reasonable 'as to' someone else, presumably the consenting co-occupant *and any other absent co-occupants.*" (Emphasis added.) Id., 137 (Roberts, C. J., dissenting).

pant who is present at the scene is illegal. It is therefore unnecessary to decide this issue under our state constitution.