******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JAQUWAN BURTON
## (AC 41807)

DiPentima, C. J., and Prescott and Bright, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of murder, criminal possession of a firearm and carrying a pistol without a permit, the defendant appealed, claiming, inter alia, that the trial court improperly denied his motion to suppress certain evidence seized by the police during a warrantless search of the bedroom of his girlfriend, J, which was located in the residence of her mother, N. The defendant's conviction stemmed from an incident in which he was driven by a friend to the victim's residence to obtain marijuana, and, during the transaction, the defendant fatally shot the victim. Approximately two months later, the police went to N's residence to arrest the defendant pursuant to an outstanding arrest warrant unrelated to the homicide of the victim. N answered the door and permitted entry into the premises by the police, who proceeded upstairs to a locked bedroom where they found the defendant, who was taken into custody and brought outside to a patrol car. J, who also was in the bedroom, was escorted downstairs by the police. N initially had declined to give the police consent to search the premises, but, after the defendant told her that a gun was in the bedroom and that she should let the police get it, she signed a consent form allowing the police to search the bedroom. J signed a similar consent form. The police proceeded to search the bedroom and seized a two-tone chrome and black nine millimeter handgun, an ammunition magazine and fifteen rounds of nine millimeter ammunition from inside a dresser drawer. Thereafter, it was determined that a nine millimeter shell casing that was found at the crime scene was in substantial agreement with the nine millimeter handgun seized from the dresser in the bedroom. Prior to trial, the defendant filed a motion to suppress the evidence seized from the bedroom, asserting that the warrantless search violated his constitutional rights and, therefore, the fruit of that illegal search had to be suppressed. Following an evidentiary hearing, the trial court denied the motion. *Held*:

1. The trial court properly denied the defendant's motion to suppress the evidence seized by the police from J's bedroom, as that court's finding that N and J voluntarily had consented to the search of the bedroom by the police was not clearly erroneous: although the defendant claimed that N and J had been coerced by the police to give their consent, in making that claim the defendant relied on certain testimony of J, N and himself that the police allegedly threatened to arrest J if she refused to consent and that the police informed N and J that, if they did not consent, the police would obtain a search warrant anyway, which the court explicitly found to be not credible, and this court had to defer to the trial court's credibility assessments; moreover, the remaining evidence presented supported the court's voluntariness finding, as it showed that although there were eight to ten armed police officers at the subject premises early in the morning seeking to arrest the defendant, who was a convicted felon, potentially a gang member, had been involved in shootings and was suspected to have a weapon, there was no evidence that the officers forcibly entered the residence of N, who had granted them access, there was no evidence that two police officers who had pointed their weapons at the defendant and J when entering the bedroom used their weapons for any other purpose, including when they asked for consent, and N and J both completed and signed a consent to search form that contained disclaimers, including that the consent was given voluntarily and without duress, threats or promises of any kind; furthermore, the fact that N initially declined to consent to a search did not render the court's voluntariness finding clearly erroneous, as it showed that N possessed the ability and the will to make that decision despite what the defendant claimed were coercive conditions, and it was a strong indication of voluntariness that N and J decided to give the police consent only after the defendant had told N that there was a handgun

in the bedroom and that she should let the police get it.

2. The defendant could not prevail on his claim that the trial court improperly excluded evidence concerning the inability of two potential eyewitnesses to identify the defendant in a photographic array as the shooter, which was based on his assertion that the court improperly determined that § 8-5 (2) of the Connecticut Code of Evidence was the hearsay exception applicable to such nonidentification evidence: because W, the lead investigator in connection with the victim's homicide, was not present when the witnesses reviewed the photographic array and the defendant sought to introduce the witnesses' nonidentification of the defendant in an assertive manner as evidence that they could not identify the defendant as the shooter, the trial court correctly concluded that W's testimony was hearsay and was admissible only if it fell within a hearsay exception, and that § 8-5 (2) of the Connecticut Code of Evidence was not applicable to W's testimony where, as here, the witnesses were not available to be cross-examined, and, therefore, in light of the defendant's failure to identify any other hearsay exception that would have applied to W's testimony, there was no basis to conclude that the trial court erred in excluding W's testimony regarding the nonidentifications by the witnesses; moreover, because certain photographic array documents that were offered into evidence by the defendant were offered for the inference of the witnesses' nonverbal assertive acts drawn from the documents, the business records exception to the hearsay rule did not apply to the inference that the witnesses could not identify the defendant from the photographic array because that fact was not contained in the documents themselves and was based on hearsay implied from a combination of the documents and the witnesses' assertive actions or inactions, and in light of the defendant's failure to identify any other hearsay exception that would have allowed for the admission of the photographic array documents, the court properly excluded them.

3. The trial court did not abuse its discretion in concluding that a video recording of an interview between an eyewitness and the police was not sufficiently reliable or trustworthy to support its admission under the residual exception to the hearsay rule set forth in § 8-9 of the Connecticut Code of Evidence: the reliability and trustworthiness of the interview was undermined by the inability of the state to question the witness as to her ability to perceive the shooter and the events on the evening of the shooting and to cross-examine her as to the critical uncertainties contained within the interview, and the evidence presented at trial failed to corroborate in many material respects, and actually contradicted, the witness' version of the events; moreover, because the trial court properly excluded the video recording of the interview, the defendant's constitutional claim necessarily failed.

Argued February 13—officially released August 13, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder, criminal possession of a firearm and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven, where the court, *Alander, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the matter was tried to the jury; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *John P. Doyle, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, Jaquwan Burton, appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress items of evidence seized from his girlfriend's bedroom located at her mother's residence because neither his girlfriend nor her mother provided voluntary consent to search therein, (2) excluded evidence concerning the inability of two eyewitnesses to identify extrajudicially the defendant from a photographic array as the shooter, and (3) excluded from evidence a video recording of an interview between an eyewitness and the police. We affirm the judgment of the trial court.

The relevant facts, as reasonably could have been found by the jury, and procedural history, are as follows. On the evening of February 10, 2014, the defendant called his friend, John Helwig, and indicated that he wanted a ride to buy some marijuana. Helwig, in his gray or "greenish" car, picked up the defendant at a house on Valley Street in New Haven, at which the defendant's girlfriend, Laneice Jackson, resided with her mother, Patrice Nixon. Helwig then picked up two other males, and the defendant instructed Helwig to drive to an address in the proximity of 31 Kossuth Street in New Haven and to park on a side street. When they arrived, the defendant exited the vehicle alone and was talking on his cell phone to the victim, Kyle Brown-Edwards, about a marijuana transaction. The defendant stated to the victim that he was "right around the corner," and then the defendant walked away behind the vehicle.

Meanwhile, the victim and his friends, Joseph Cordy and Perry,[2] were present on the second floor of the victim's residence at 31 Kossuth Street. After speaking with the defendant on his cell phone, the victim, at approximately 8:30 p.m., with marijuana in his possession, proceeded to go downstairs to the front entrance of the residence. While standing in the doorway of the front entrance, the victim was shot in the face by the defendant. Cordy heard the gunshot, observed the victim at the bottom of the stairs, and then called the police. At the same time, the victim's cousin, Jeremy Brown, and Jeremy's girlfriend, Morgan Brown, were somewhere outside the residence at 31 Kossuth Street.

Approximately five minutes after he left Helwig's vehicle, the defendant sprinted back to the vehicle with a gun in his hand and, after entering the vehicle, pointed the gun at Helwig and told him to drive. Helwig then drove to his grandmother's residence. There, the defen-

dant told Helwig that he had planned to rob the victim, but, after the victim declined "to give it up" and gave him "a weird look," he shot the victim in the face. The defendant also asked Helwig for some cleaner to remove the blood from his sneakers.

At approximately 8:30 p.m., New Haven police were dispatched to 31 Kossuth Street in response to a report of someone being shot and, upon arrival, observed that the victim had a gunshot wound to his head. The victim was transported to a hospital, and he died as a result of his injuries. Later that same night, New Haven police investigated the crime scene and seized a single nine millimeter shell casing from the floor at the bottom of the staircase near the doorway inside 31 Kossuth Street. New Haven police also seized the victim's cell phone, which was provided to them by Cordy. An examination of the victim's cell phone revealed one missed call and two completed calls on February 10, 2014, between 8:21 p.m. and 8:31 p.m., from the defendant's cell phone.

On the morning of April 3, 2014, several law enforcement officers went to 461 Valley Street to arrest the defendant pursuant to an outstanding arrest warrant unrelated to the homicide of the victim. Nixon answered the door and permitted State Trooper Chris McWilliams and New Haven Police Sergeant Karl Jacobson and Detective Martin Podsiad to enter the premises. McWilliams and Podsiad proceeded upstairs to a locked bedroom, and, after they had knocked, the defendant opened the door. The defendant was taken into custody and brought outside to a patrol car. Jackson, who also was in the bedroom, was escorted downstairs. The officers did not have a search warrant, but they received written consent to search the bedroom from both Jackson and Nixon. The officers searched the bedroom and seized, among other things, a two-tone chrome and black nine millimeter handgun, an ammunition magazine, and fifteen rounds of nine millimeter ammunition from inside a dresser drawer.

Further investigation revealed that the nine millimeter shell casing that was found at the crime scene was in "substantial agreement" with the nine millimeter handgun seized from the dresser in the bedroom. Furthermore, the defendant's friends had seen him always carrying a particular nine millimeter gun that matched the two-tone appearance of the gun found in the dresser. Also as part of their investigation, law enforcement seized the defendant's cell phone. Thereon, they discovered a video of the defendant reacting to a television news report of the victim's murder, and pictures of himself, prior to the shooting, holding a two-tone handgun matching the one found in the dresser. The defendant thereafter was charged with murder, criminal possession of a firearm, and carrying a pistol without a permit. He pleaded not guilty and elected a jury trial.

On March 31, 2016, before trial, the defendant filed

a motion to suppress the evidence seized from the bedroom at 461 Valley Street, specifically including the nine millimeter handgun, tests performed thereon, and any testimony related thereto. The defendant maintained that the warrantless search of the bedroom at 461 Valley Street violated his rights under the fourth amendment to the constitution of the United States and article first, § 7, of the constitution of Connecticut and, thus, he argued that the fruit of those searches must be suppressed. In contrast, the state argued that the searches and seizures did not violate the defendant's constitutional rights because both Jackson and Nixon provided voluntary consent to search the bedroom.

On January 30, 2017, after a two day evidentiary hearing, the court issued a memorandum of decision in which it denied the defendant's motion to suppress. Therein, the court found that the credible evidence established that the state proved that the warrantless search of the bedroom at 461 Valley Street and seizure of the handgun therein did not violate the defendant's constitutional rights because consent to search was freely and voluntarily given by Jackson and Nixon, who were the individuals with the requisite authority to do so.

Thereafter, the defendant's case proceeded to a jury trial. During the state's case-in-chief, the defendant sought to introduce testimony and documentary evidence to establish that Morgan Brown and Jeremy Brown (collectively, the Browns), who were potential eyewitnesses to the murder and not available to testify at trial, each previously had been unable to identify the defendant in a photographic array. The defendant first asked Detective Michael Wuchek, who was the lead investigator in connection with the homicide of the victim, whether the Browns were able to identify the defendant in a photographic array. The state objected, and the court excused the jury. The court heard argument and sustained the state's objection on the ground that Wuchek's testimony as to whether the Browns were able to identify the defendant was hearsay and, because they were unavailable to testify, the pretrial identification exception to the hearsay rule; see Conn. Code Evid. § 8-5 (2);[3] did not apply to his testimony. Second, still outside the presence of the jury, defense counsel made an offer of proof as to the photographic array documents shown to the Browns. Those documents included a single sheet containing eight photographs of individuals, including the defendant, and two instruction sheets, one purportedly signed by Morgan Brown and one purportedly signed by Jeremy Brown. Defense counsel argued that these documents were admissible pursuant to the business records exception to the hearsay rule. See Conn. Code Evid. § 8-4 (a).[4] The state objected, and the court sustained the objection on the ground that the inference drawn from the documents that the Browns were unable to identify the defendant consti-

tuted hearsay that was not excepted from the hearsay rule pursuant to § 8-5 (2) of the Connecticut Code of Evidence.

Several days later, in the course of the state's case-in-chief, the defendant filed a motion to admit into evidence the video recording of an interview between Morgan Brown and the police on the night of the victim's murder because he believed that Morgan Brown's description of the events that night contradicted the state's evidence in certain important respects. In his memorandum of law in support of his motion to admit, the defendant maintained that the video recording was admissible pursuant to the residual exception to the hearsay rule. See Conn. Code Evid. § 8-9.[5] The next day, the court, after it heard argument from both parties, issued an oral decision in which, after expressing doubt as to whether the defendant had established that Morgan Brown was unavailable, it denied the defendant's motion on the ground that the interview was not trustworthy and reliable because the state would be unable to cross-examine Morgan Brown about the inconsistencies therein.

The jury subsequently found the defendant guilty of all charges, and the court, after rendering judgment in accordance with the verdict, sentenced the defendant to a total effective sentence of fifty-five years incarceration and imposed a fine of $5000. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion to suppress several items of evidence seized from Jackson's bedroom located at Nixon's residence because neither Jackson nor Nixon provided voluntary consent to search therein. Specifically, he contends that the court erroneously found that both Jackson and Nixon had provided free and voluntary consent to search the bedroom because the evidence presented at the motion to suppress hearing established that they were coerced by the law enforcement officers into providing consent. The defendant argues that the warrantless search of the bedroom by the law enforcement officers violated his constitutional rights, and, therefore, the items of evidence seized from this search should have been suppressed. We disagree.

In its memorandum of decision denying the defendant's motion to suppress, the court found the following additional facts. "Law enforcement officers . . . were seeking to serve two arrest warrants on the defendant, [who] . . . was a convicted felon and a suspected gang member. The officers also possessed information from a confidential informant that the defendant was in possession of a weapon, [had previously been involved in shootings], and was residing with his girlfriend . . . [Jackson] . . . [i]n one of two houses in the Valley

Street area of New Haven. On April [3], 2014, eight to ten law enforcement officers went to 461 Valley Street in New Haven to determine whether the defendant was at that address and to serve the arrest warrants. They arrived at approximately 6 a.m. Three of the officers approached the front door of the dwelling, while the remaining officers took up positions outside the perimeter of the house. The three officers were armed. Karl Jacobson, a sergeant with the New Haven Police Department, was armed with a handgun, while . . . Podsiad . . . and State Trooper McWilliams were armed with assault rifles. Jacobson knocked on the front door, which was eventually answered by . . . Nixon, who was the lessee of the home. Nixon opened the door and let the three officers inside the house. Jacobson asked Nixon whether the defendant was there to which Nixon replied that she did not think so. Jacobson then asked Nixon if they could look to see if the defendant was present and Nixon responded, 'go ahead.' Jacobson stayed with Nixon as Podsiad and McWilliams searched the premises for the defendant. The two officers proceeded to an upstairs bedroom and knocked on the door, which was locked. The defendant opened the door and was immediately arrested and handcuffed. Also inside the bedroom was . . . Jackson . . . .

"The defendant was eventually brought outside and placed inside a patrol car. Nixon initially declined to consent to a search of the premises. At some point, Jacobson was informed by a patrol officer that the defendant wanted to speak with him. Jacobson went to the patrol car where the defendant was in custody. The defendant volunteered that the gun they were looking for was in the bedroom and he did not want anyone else to get in trouble for it. Jacobson informed the defendant that Nixon would not consent to a search. Upon hearing this news, the defendant asked to speak with Nixon. The defendant's request was accommodated, whereupon the defendant told Nixon that the gun was in the bedroom and to 'just let them get it.' Nixon then signed a consent form allowing the officers to search the bedroom. Jackson signed a similar consent form. Each form stated that the signer ha[d] been informed of her constitutional right not to have a search made without a search warrant and her right to refuse to consent to a search. The form also stated that permission to search [was] being given 'voluntarily and without duress, threats, or promises of any kind.' After obtaining the written consent to search from Nixon and Jackson, Podsiad searched the bedroom and seized the subject handgun located in a dresser drawer."

The court also specifically credited the testimony of the law enforcement officers and discredited the conflicting testimony of Jackson, Nixon, and the defendant. The court stated that "Nixon and Jackson disputed the above facts in important respects. Jackson testified

that she returned to the bedroom prior to her signing the consent form to obtain clothes for the defendant and that it was apparent from the disarray of the room and the open dresser drawer that it had already been searched. [The court] find[s] this testimony not to be credible. It is contradicted by the testimony of Podsiad that no civilian was allowed back into the bedroom after it was initially vacated by Jackson and the defendant, as well as the testimony of Nixon . . . that Jackson did not go back upstairs.

"Nixon testified that she was coerced into consenting to a search of the bedroom because she was told by a police officer that Jackson would be arrested if the police were required to obtain a search warrant and a handgun was found. Nixon testified that, since [Jackson] was pregnant and she was concerned that she might be arrested, she was forced to consent to the search. Jackson and the defendant offered testimony, which supported Nixon's version of events. [The court] do[es] not find any of this testimony to be credible. Rather, [the court] credit[s] the testimony of Jacobson, the lead law enforcement officer during the search and the person who witnessed the signing of the two consent forms, that neither Nixon nor Jackson [were] coerced or threatened in any way."

We turn next to the well established law and standard of review that governs the defendant's claim. Both the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut protect individuals from unreasonable searches and seizures. "Under both the fourth amendment to the federal constitution and article first, § 7, of the state constitution, a warrantless search of a home is presumptively unreasonable." (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 69, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

"A warrantless search is not unreasonable under either the fourth amendment to the constitution of the United States or article first, § 7, of the constitution of Connecticut if a person with authority to do so has freely consented to the search. . . . The state bears the burden of proving [by a preponderance of the evidence] that the consent was free and voluntary. . . . The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. . . . The question whether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied . . . is a question of fact to be determined from the totality of all the circumstances. . . . We may reverse [the trial court's factual findings] on appeal only if they are clearly erroneous. . . . Thus, [w]hether there was valid consent to a search is a factual question that will not be lightly overturned on appeal."

(Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 249–50, 3 A.3d 806 (2010); see *State* v. *Azukas*, 278 Conn. 267, 277–78, 897 A.2d 554 (2006) (delineating principles of valid third-party consent of residence).

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Internal quotation marks omitted.) *State* v. *Davis*, 331 Conn 239, 246, 203 A.3d 1233 (2019).

"Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Castillo*, 329 Conn. 311, 322, 186 A.3d 672 (2018).

On appeal, it is undisputed that the law enforcement officers did not have a search warrant and that Jackson and Nixon had the authority to give and actually provided consent to search the bedroom; the issue, therefore, is whether their consent was voluntary. The defendant argues that the consent was not voluntary because, under the totality of the circumstances, Jackson and Nixon had been coerced to give their consent.[6] In support of his argument, the defendant relies on the testimony of Jackson, Nixon, and himself that the officers allegedly threatened to arrest Jackson if she refused to consent and that the officers informed them that, if they did not consent, the officers would obtain a search warrant anyway.[7] The defendant also relies on the evidence presented that Nixon initially refused to consent, there was a large number of armed officers present within the home at an early hour in the morning, and Jacobson told Nixon that it was okay if she did not consent because they were applying for a warrant to search the house.

The initial problem with the defendant's claim is that he relies, in part, on the testimony of Jackson, Nixon, and himself, which the court explicitly found to be not credible. In light of the principle that we must defer to the credibility assessments of the trial court, the

testimony of Jackson, Nixon, and the defendant as to the allegedly coercive statements made by the police are removed from our determination as to whether the court's voluntariness finding was clearly erroneous. See id.; see also *State* v. *Martinez*, 49 Conn. App. 738, 745–46, 718 A.2d 22 (declining to second-guess trial court's assessment that discredited individual's testimony that she did not consent to search), cert. denied, 247 Conn. 934, 719 A.2d 1175 (1998).

On the basis of the remaining evidence presented, we conclude that the court's voluntariness finding was not clearly erroneous. Although there were eight to ten armed officers at the premises early in the morning, this was due to the fact that they were seeking to arrest the defendant, who was a convicted felon, potentially a gang member, had been involved in shootings, and was suspected to have a weapon. See *State* v. *Gray-Brown*, 188 Conn. App. 446, 458–59, 204 A.3d 1161 (rejecting argument that "consent was coerced because the search occurred in the early morning and twelve police officers were present at the house" where police believed that suspect was armed and responsible for homicide), cert. denied, 331 Conn. 922, 205 A.3d 568 (2019). There was no evidence that the officers forcibly entered the home; rather, three of the officers were granted access to the premises by Nixon, and she willingly answered their question as to whether she knew if the defendant was present. See *State* v. *Reynolds*, 264 Conn. 1, 45, 836 A.2d 224 (2003) (determining that finding of voluntary consent to search not clearly erroneous where officers requested permission to enter premises and did not use loud or threatening language or point their guns at anyone), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Although two officers pointed their weapons at the defendant and Jackson when entering the bedroom, there was no evidence that the police used their weapons for any other purpose, including when they asked for consent. See *State* v. *Jenkins*, supra, 298 Conn. 254 (presence of armed officers, although factor to be considered, "does not render the atmosphere coercive"). Further, Jackson and Nixon each completed and signed a consent to search form that contained disclaimers, including that the consent was given "voluntarily and without duress, threats, or promises of any kind."

Moreover, the fact that Nixon initially declined to consent to a search does not render the court's voluntariness finding clearly erroneous; rather, it shows that she possessed the ability and the will to make that decision despite what the defendant claims were coercive conditions. See *State* v. *Brunetti*, supra, 279 Conn. 56 ("because refusal to sign a consent to search form is one of several factors to be considered in determining the validity of consent, such refusal does not vitiate consent otherwise found to be valid in light of all of the circumstances"). Indeed, it is a strong indication

of voluntariness that Jackson and Nixon decided to provide the officers consent only after the defendant told Nixon that the gun was in the bedroom and that she should "just let them get it."

Finally, Jacobson testified that after Nixon initially refused consent to search, he sent officers back to the police station to start "drafting up a [search] warrant." He did not testify, however, that he told Nixon or Jackson that he would get a warrant if they did not consent. Furthermore, he testified that after the defendant told him there was a gun in the bedroom, Jacobson told the defendant that Nixon and Jackson were not consenting to a search so the police were going to apply for a search warrant. Jacobson never testified that any such statement was made to Nixon or Jackson, or that they were aware of Jacobson's conversation with the defendant when they consented to the search.

We conclude that the evidence presented supported the court's finding that Jackson and Nixon voluntarily consented to the officers' request for permission to search the bedroom, and, therefore, the court properly denied the defendant's motion to suppress the evidence seized by the police from the bedroom.[8]

## II

The defendant next claims that the court improperly excluded evidence concerning the inability of the Browns to identify extrajudicially the defendant in a photographic array as the shooter. The defendant argues that the court improperly determined that § 8-5 (2) of the Connecticut Code of Evidence was the hearsay exception applicable to the evidence of nonidentification in the form of the testimony of Wuchek and the photographic array documents. We conclude that the court did not improperly exclude the evidence of nonidentification.

The following additional facts are relevant to our resolution of the defendant's claim. Wuchek testified as part of the state's case-in-chief. On cross-examination, Wuchek testified that the Browns, as potential eyewitnesses, were interviewed by the police on the night of the murder. He testified that, two months after the murder, the Browns were recalled to the police station where they each separately completed a review of a photographic array. Wuchek averred that he did not administer either array. Consequently, he was not in a position to testify regarding how the Browns responded to the photographic array, and, thus, he could not confirm whether they affirmatively said that they did not see the shooter, were uncertain if the shooter was in the array, or were silent after reviewing the array. Nevertheless, he outlined that it was the then existing practice of the police to present to the witness eight photographs of people similar in appearance, including a picture of the suspect, one at a time. The witness then

would state whether any of the pictures represented the individual that they saw commit the crime. After Wuchek answered that the Browns each had completed a review of a photographic array, which included a picture of the defendant, defense counsel then asked whether the Browns were able to identify the defendant from the photographic array. The state objected, and the court excused the jury.

At the outset, the court recognized that the question called for hearsay, and it stated that the relevant hearsay exception was § 8-5 (2) of the Connecticut Code of Evidence, which excepts pretrial identification evidence from the hearsay rule when the witness is available to testify at trial. The court stated that, on the basis of a conversation with counsel in chambers, it understood that the Browns both were unavailable to testify. The state then represented that it had confirmed that, to the best of its knowledge, Morgan Brown was on active duty in the United States Air Force in Texas, and Jeremy Brown also was in the state of Texas, but not assigned to the Air Force. Defense counsel confirmed that he had not been able to verify the Browns' addresses or to contact them. Accordingly, the court determined that, because the Browns would not be available at trial for cross-examination, Wuchek's testimony as to whether they previously had been able to identify the defendant in a photographic array was not excepted from the hearsay rule pursuant to § 8-5 (2) of the Connecticut Code of Evidence.

Next, defense counsel made an offer of proof as to a pair of two page documents that constituted the one page New Haven Police Department "witness instructions—identification procedures" and a one page compilation of the photographic array. The two sheets of instructions were completed and individually signed by the Browns and New Haven Police Sergeant David Zannelli. The two photographic arrays contained eight pictures of individuals with comparable appearances, including the defendant, as well as their corresponding names. Neither photographic array contained any markings. In response to several questions posed by defense counsel, Wuchek testified that he recognized the documents, but that the photographs depicted in the arrays would have been presented separately to the Browns and that the Browns would not have been shown the names of the individuals. He testified that the police maintain the photographic array records as part of their investigation and case file. He also testified that if a witness were to identify an individual in the array, they would mark that individual's picture, and, if the witness were unable to identify an individual in the array, no marks would be made. Defense counsel then asked that the documents be admitted as business records for the purpose of establishing that the Browns could not identify the defendant. The state objected on the ground of relevancy.

The court reasoned that these documents, which did not indicate whether the Browns were able to identify any of the individuals, were relevant only if the Browns' identification or lack of identification also was admissible as evidence. Defense counsel argued that the documents were relevant because the jury could draw a reasonable inference therefrom that there was no positive identification. The court then determined that, if the documents were used for the purpose of inferring the lack of a positive identification, then that evidence was not admissible pursuant to § 8-5 (2) of the Connecticut Code of Evidence because the Browns were unavailable to be cross-examined at trial.

We turn next to the well established law and standard of review that governs the defendant's claim. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 181, 193 A.3d 1 (2018), cert. denied,     U.S.     , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

"It is well settled that . . . [a]n out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." (Internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 837, 100 A.3d 361 (2014). Evidence offered for the purpose of establishing whether the declarant extrajudicially identified a defendant is hearsay. See *State* v. *Outlaw*, 216 Conn. 492, 496–98, 582 A.2d 751 (1990). This identification evidence may be excepted from the hearsay rule if the requirements of § 8-5 (2) of the Connecticut Code of Evidence are met. That section provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial . . . (2) The identification of a person made by a declarant prior to trial where the identification is reliable." Conn. Code Evid. § 8-5 (2).

Furthermore, a hearsay document may be excepted from the hearsay rule pursuant to § 8-4 (a) of the Connecticut Code of Evidence, which provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter." See also General Statutes § 52-180 (governing admissibility

of business entries); *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 779–80, 882 A.2d 653 (2005) (outlining three requisite conditions for admissibility of business record).

In the present case, the defendant twice sought to introduce the fact that the Browns, although they were in close proximity to 31 Kossuth Street at the time the victim was shot, were unable to identify the defendant, from a photographic array, as the shooter. He sought to introduce this fact through the testimony of Wuchek as well as through the photographic array documents. The defendant argues that the court improperly identified § 8-5 (2) of the Connecticut Code of Evidence as applicable to his offers of proof.

With respect to the testimony of Wuchek, the defendant argues that the pretrial identification hearsay exception does not apply because his answer would have revealed that the Browns failed to identify the defendant, not that they positively identified him. He argues that the language of § 8-5 (2) of the Connecticut Code of Evidence was intended to govern only positive identifications, as opposed to a failure to make an identification. Because the defendant has identified no other hearsay exception that would have made Wuchek's testimony admissible, the defendant's argument necessarily relies on an assumption that testimony from Wuchek that the Browns did not identify the defendant when shown the photographic array would not have been hearsay at all. We disagree.

Hearsay includes not only verbal and written statements, but also "nonverbal conduct of a person, if it is intended by the person as an assertion." Conn. Code Evid. § 8-1 (1) (B); see *State* v. *Burney*, 288 Conn. 548, 561, 954 A.2d 793 (2008). For example, an out-of-court nod or shake of the head in response to a question is as much an assertion subject to the hearsay rules as if the person had answered the question verbally or in writing. See *State* v. *King*, 249 Conn. 645, 670–71, 735 A.2d 267 (1999). Similarly, testimony that a person was silent in response to a question or did not mention a particular fact may constitute hearsay when offered to prove the existence or nonexistence of the fact. Id., 672; see also *State* v. *Rosado*, 134 Conn. App. 505, 519, 39 A.3d 1156, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012).

For example, in *King*, our Supreme Court addressed the issue of whether testimony as to the nonverbal conduct of a declarant was assertive and, thus, constituted hearsay. *State* v. *King*, supra, 249 Conn. 670–72. At the defendant's murder trial, defense counsel sought to introduce the testimony of a police officer who had shown a photographic array, which included a picture of the defendant, to the victim's younger sister, who was present at the home where the murder occurred. Id., 652–53, 670, 673. Defense counsel expected the

police officer to testify that the victim's sister "did nothing" when presented with the picture of the defendant. Id., 670 n.31. The state objected on the ground that this testimony was inadmissible hearsay because defense counsel sought to treat the silence of the victim's sister as an assertion that she could not identify the defendant. Id., 671. The trial court sustained the state's objection. Id. On appeal, our Supreme Court held that the trial court properly excluded the officer's testimony because the silence of the victim's sister was offered by defense counsel to establish only that she failed to identify the defendant from the photographic array. Id., 672. As such, the declarant's silence was "a nonverbal assertion or statement" that constituted "inadmissible hearsay." Id.

The same is true in the present case. The defendant sought to have Wuchek testify that the Browns did not identify the defendant's picture when they reviewed the photographic array. As in *King*, the defendant sought to introduce the Browns' nonidentification of the defendant in an assertive manner, as evidence that the Browns could not identify the defendant as the shooter. Because Wuchek was not present when the Browns reviewed the photographic array, it is unclear exactly how they responded, if at all, to the defendant's photograph. Nevertheless, it does not matter. Whether the Browns affirmatively excluded the defendant's picture, shook their heads when asked if they saw the shooter, or were silent, makes no difference when their nonidentification is offered in an assertive manner. Clearly, testimony as to the Browns' verbal responses or nonverbal conduct, if offered through Wuchek, would constitute hearsay because the defendant would be offering the Browns' conduct for the truth of the matter asserted. We see no reason why the same rule, as outlined in *King*, should not apply to Wuchek's testimony that the Browns did not identify the defendant from the photographic array. Consequently, the court was correct in concluding that Wuchek's testimony regarding the Browns' nonidentification of the defendant was hearsay and was only admissible if it fell within a hearsay exception. The court also correctly concluded that § 8-5 (2) of the Connecticut Code of Evidence was not applicable to Wuchek's testimony because the Browns were not available to be cross-examined.[9] Because the defendant has not identified any other hearsay exception that would have applied to the proffered testimony, there is no basis to conclude that the court in any way erred in excluding Wuchek's testimony regarding the nonidentifications by the Browns.

With respect to the photographic array documents, the defendant argues that the court improperly determined that the pretrial identification exception, as opposed to the business records exception, was the applicable hearsay exception. The defendant offered these photographic array documents for the relevant

purpose of establishing an inference that the Browns were unable to identify the defendant, from the photographic array, as the shooter.[10] When offered for that purpose, the inference that the Browns were unable to identify the defendant constituted implied hearsay in the form of a nonverbal assertion.

This relevant inference constituted implied hearsay because, although the offered documents themselves do not establish whether the Browns were able to identify the defendant, this fact can be inferred from Wuchek's foundational testimony in conjunction with the lack of markings on the documents. See *State* v. *Jones*, 44 Conn. App. 476, 486, 691 A.2d 14 (implied hearsay occurs when "although a witness did not repeat the statements of [the declarant], his or her testimony presented to the jury, by implication, [revealed] the substance of the [the declarant's] statements"), cert. denied, 241 Conn. 901, 693 A.2d 304 (1997); *In re Jose M.*, 30 Conn. App. 381, 386, 620 A.2d 804 ("The conversation was not repeated verbatim by [the coconspirator] but, nevertheless, his testimony expressly conveyed the substance of the conversation. As such, [the coconspirator's] testimony, by implication, presented out-of-court statements that if offered as assertions or to prove the facts asserted would run afoul of the hearsay rule."), cert. denied, 225 Conn. 921, 625 A.2d 821 (1993); see also *Dutton* v. *Evans*, 400 U.S. 74, 88, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970) (recognizing that witness' statement included implicit identification of accused). Accordingly, we must determine whether this inference of nonverbal conduct was admissible under the business records exception as claimed by the defendant.

The business records exception, however, applies, at most, to the contents of the documents themselves and not to the implied hearsay drawn therefrom. "[O]nce [the criteria of business records exception] have been met by the party seeking to introduce the record . . . it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . For example, the information contained in the record must be relevant to the issues being tried. . . . In addition, the information contained in the [record] must be based on the entrant's own observation or on information of others whose business duty it is to transmit it to the entrant. . . . If the information does not have such a basis, it adds another level of hearsay to the [record] which *necessitates a separate exception to the hearsay rule in order to justify its admission*." (Emphasis added; internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 593–94, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007); see *Pagano* v. *Ippoliti*, 245 Conn. 640, 651, 716 A.2d 848 (1998) (meeting notes admissible as business record but their description of statements made by meeting participant constituted inadmissible

hearsay).

In the present case, the photographic array documents were offered not for the information contained therein, but for the inference of the Browns' nonverbal assertive acts that is drawn from the documents. Thus, the business records exception does not apply to the inference that the Browns could not identify the defendant from the photographic array because that fact is not contained in the documents themselves, but is based on hearsay implied from a combination of the documents and the Browns' assertive actions or inactions. Accordingly, in light of our conclusion that the business records exception does not apply to the implied hearsay, the defendant was required to identify an applicable hearsay exception that would allow for its admission. Because the defendant has failed to identify any applicable exception, we conclude that the court properly excluded the evidence concerning the inability of the Browns to identify extrajudicially the defendant in a photographic array.

The defendant also argues that, notwithstanding its evidentiary admissibility, the evidence of nonidentification was "constitutionally admissible pursuant to the defendant's rights to due process and to present a defense." We disagree. Our conclusion that the court properly applied the rules of evidence to exclude this evidence disposes of the defendant's constitutional claim. See *State* v. *Bennett*, 324 Conn. 744, 764, 155 A.3d 188 (2017) ("[i]f . . . we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail" [internal quotation marks omitted]).

### III

The defendant finally claims that the court improperly excluded from evidence a video recording of an interview between Morgan Brown and the police. The defendant argues, contrary to the court's ruling, that the video recording of the interview was admissible pursuant to the residual exception to the hearsay rule; see Conn. Code Evid. § 8-9; because there was a reasonable necessity for its admission and it was trustworthy and reliable. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. During the state's case-in-chief, the defendant filed a motion to admit the entire video recording of an interview between Morgan Brown and the police (interview), and a memorandum of law in support thereof. The interview took place at the New Haven Police Department on the night of the murder of the victim. In the course of the interview, which later was transcribed, Morgan Brown provided the following description of events in response to a series of questions posed by New Haven police detectives. She and Jeremy Brown were sitting in a parked

vehicle in front of 31 Kossuth Street when they observed a vehicle driven by a young female with a light complexion park on Ann Street. She first answered that the female driver was white, but then immediately corrected her answer to say that she was black. She described the female as wearing her hair down, not up. She further stated that she did not know what kind of car the female was driving because she "was not really paying attention to it," and there were "so many" cars because it was a busy street. Nonetheless, she gave a description of the car as a newer, plain, charcoal grey, four door car with dark tinted windows.

She stated that, approximately two to five minutes later, "a boy comes out, well, I didn't see him come out [of] the car, but you put two and two together. He walk[ed] down the street smoking a cigarette" and approached the entrance to 31 Kossuth Street. On the way to the entrance, the boy walked in front of the Browns' car and looked at them. She stated that "he looked young, but [she] did [not] really see his face," but she described the boy as black, about five feet, nine inches tall, skinny, wearing a dark hooded sweatshirt, with the hood up, jeans, and black shoes. Several questions later, she described the boy as having light skin.

After the victim opened the door, the boy entered the residence and, while the door stayed open, she "just heard the shot. He ran out [of] the house, ran across the street, hopped in the car, and they pulled off." The boy had passed them again on the way back to his car, and she did not see him with a gun. Morgan Brown then entered 31 Kossuth Street and saw the victim lying on the ground bleeding from his head just inside the entrance.

The defendant sought to admit the entire video recording of the interview pursuant to the residual exception to the hearsay rule. See Conn. Code Evid. § 8-9. At oral argument on the motion, held outside the presence of the jury, the defendant maintained that the interview was reasonably necessary to his case because Morgan Brown was unavailable for trial, and that the interview was reliable on the basis of the circumstances. The state opposed the admission of the interview. The state disputed that admission of the video recording of the interview was necessary because defense counsel had not undertaken all efforts to procure Morgan Brown for trial. See General Statutes § 54-82i (c) (delineating procedures to summon out-of-state material witness). The state also argued that it would not have an opportunity to cross-examine Morgan Brown regarding the inconsistent statements made in the interview and that the interview is not categorically reliable because it was given to the police and recorded on video.

The court then orally denied the defendant's motion to admit the video recording of the interview. The court

initially expressed its concern whether the defendant had undertaken sufficient efforts to procure Morgan Brown's attendance by way of an interstate subpoena, but it rested its decision on the sole ground that the interview failed to meet the trustworthy and reliable requirement. In particular, the court recognized that the interview occurred immediately after the shooting, was given to the police, and was video recorded, but it determined that those circumstances, alone, did not make the interview trustworthy and reliable. The court reasoned that the inability of the state to cross-examine Morgan Brown as to the "clear ambiguities in her statement," and her ability to perceive the shooter, were fatal to the admission of the video recording of the interview.

We turn next to the law and standard of review that governs the defendant's claim. "[I]n order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Internal quotation marks omitted.) *State* v. *Jenkins*, 271 Conn. 165, 189, 856 A.2d 383 (2004); see *State* v. *Bennett*, supra, 324 Conn. 761–62 (affording abuse of discretion review to claim that court improperly determined that hearsay statement was not admissible under residual exception).

"The legal principles guiding the exercise of the trial court's discretion regarding the admission of hearsay evidence under the residual exception are well established. An [out-of-court] statement is hearsay when it is offered to establish the truth of the matters contained therein. . . . As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions. . . . The purpose behind the hearsay rule is to effectuate the policy of requiring that testimony be given in open court, under oath, and subject to cross-examination." (Internal quotation marks omitted.) *State* v. *Bennett*, supra, 324 Conn. 762. Section 8-9 of the Connecticut Code of Evidence, which is "[t]he residual, or catchall, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions. . . . [T]he residual hearsay exceptions [should be] applied in the rarest of cases . . . ." (Citations omitted; internal quotation marks omitted.) Id.

In *Bennett*, our Supreme Court considered whether the trial court abused its discretion in denying the admission, pursuant to § 8-9 of the Connecticut Code of Evidence, of a recorded statement made by a purported eyewitness to the police on the same day that the victim had been murdered. Id., 760. There, the trial court

"rested its decision solely on the ground that [the witness'] statement lacked sufficient reliability and trustworthiness." Id., 763. Our Supreme Court concluded that the trial court had not abused its discretion in denying the admission of the witness' statement because the witness "had never been subjected to cross-examination regarding the circumstances surrounding her observations of the incident. A declarant's availability for cross-examination has been deemed particularly significant in determining whether hearsay evidence is supported by guarantees of trustworthiness and reliability. . . . [The witness] conceded in her statement that the lighting was too limited to make out any distinguishing features of the people at the scene. [The witness] was never subject to cross-examination to further explore her ability to properly observe the events that she reported or her ability to accurately hear the sounds and statements that she had reported (i.e., how far she was from the incident, whether she has any visual or hearing impairments, whether there were obstructions or distractions at the time). . . .

"Additionally, the evidence at trial not only failed to materially corroborate [the witness'] statement, it contradicted her statement in part. . . . None of the witnesses reported hearing any gunshots, and [the victim's] injuries were inflicted by a knife. [The witness'] report that a man in a yellow shirt was kneeling beside the victim stating, Oh, I killed him. I killed him, was consistent with the other witnesses only insofar as they reported that [the victim's friend] wore a yellow shirt as he knelt by [the victim]; no one reported that anyone had made statements remotely consistent with that statement or any others recounted by [the witness]. Given that [the witness'] report of this inculpatory statement constituted hearsay within hearsay, the lack of corroboration bore significantly on its indicia of reliability." (Citations omitted; internal quotation marks omitted.) Id., 763–64.

In the present case, as in *Bennett*, the eyewitness, Morgan Brown, never was subjected to cross-examination; thus, the trustworthiness and reliability of the interview is undermined by the parties' inability to question her as to her ability to perceive the events that night. We agree with the trial court that cross-examination was particularly important given the substance of Morgan Brown's interview. She told the police that the driver was a black female with a light complexion, however, it is unclear the extent to which the allegedly dark tinted windows on the female's vehicle hindered Morgan Brown's observation. She also provided a description of the car that was driven by the female, but could not recall anything distinctive about it because there were "so many" cars because it was a busy street, and she "really wasn't paying attention to it." She also told the police that the shooter had twice walked directly in front of the vehicle in which she was

sitting and looked at her, but she later discounted her observation by stating that she "did [not] really see his face" and that he was wearing the hood on his sweatshirt.

The state also did not have the opportunity to cross-examine Morgan Brown as to the critical uncertainties contained within the interview. For example, she told the police that she saw the shooter walking down the street and, although she did not see what car he came from, that he must have exited the female's car. She further stated that when the shooter rapidly exited the residence, he hopped in "the car and they pulled off." It is unclear from both of these statements which car, if any, the shooter came from and to which car he returned.

Furthermore, also as in *Bennett*, the evidence presented at trial failed to corroborate in many material respects, and actually contradicted, Morgan Brown's version of events. For instance, Morgan Brown stated that the car in which the shooter purportedly arrived was driven by a female, however, Helwig, a male, testified at trial that he was the driver of the car that the defendant arrived and left in. She also told the police that the shooter departed 31 Kossuth Street without a gun, conversely, there was evidence presented at trial to establish that the defendant sprinted back to the vehicle with a gun in his hand and, after entering the vehicle, he pointed the gun at Helwig and told him to go. Therefore, we conclude that the court did not abuse its discretion in concluding that the video recording of Morgan Brown's interview was not sufficiently reliable or trustworthy to support its admission under the residual exception.

The defendant also argues that, "the defendant's constitutional rights to present a defense and to confrontation and due process requires the admission of this evidence without strict adherence to the evidentiary rules." As noted in part II of this opinion, such a claim is without merit. See *State* v. *Bennett*, supra, 324 Conn. 764 ("[i]f . . . we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail" [internal quotation marks omitted]).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant originally appealed to our Supreme Court pursuant to General Statutes § 51-199 (b) (3). The appeal subsequently was transferred to this court pursuant to Practice Book § 65-1.

[2] It is unclear whether "Perry" was this individual's first or last name because he only was referred to as Perry throughout the trial.

[3] Section 8-5 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial . . . (2) The identification of a person made by a declarant prior to trial where the identification is reliable."

[4] Section 8-4 (a) of the Connecticut Code of Evidence provides: "Any writing or record, whether in the form of an entry in a book or otherwise,

made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.''

[5] Section 8-9 of the Connecticut Code of Evidence provides: "A statement that is not admissible under any of the foregoing exceptions is admissible if the court determines that (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule.''

[6] The defendant also argues that the court erroneously made three subsidiary factual findings that (1) Jackson had not returned to the bedroom to obtain clothing for the defendant, (2) Nixon and Jackson were informed that they had the right to refuse to consent to the search, and (3) no officer pointed a weapon at Nixon when they entered the home or at Nixon and Jackson when they sought consent to search the bedroom. These findings warrant little discussion because there was evidence presented at the motion to suppress hearing to support them. First, Podsiad testified that Jackson was not permitted to return upstairs, and Nixon testified that there were officers standing at the bottom of the stairs preventing anyone from going back upstairs. Second, Sergeant Jacobson testified that both Nixon and Jackson each had signed a consent to search form that contained an express disclaimer that they had "been informed of [their] constitutional rights not to have a search made without a search warrant, and [their] right to refuse to consent to such a search . . . .'' Third, although there was testimony that the officers pointed their guns at Jackson when they first entered the bedroom, as they were aware that the defendant potentially was armed, there was no evidence presented that an officer pointed a gun at Jackson at any other point in time, or at Nixon at any time.

[7] See *State* v. *Brunetti*, supra, 279 Conn. 70 ("[i]t is true that, if the police had instructed the [individual who provided consent] that they would obtain a search warrant if he had refused to give consent, then such consent would have been involuntary, for constitutional purposes, because the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant'' [internal quotation marks omitted]).

[8] The state alternatively argues on appeal that the evidence seized from the bedroom would have been admissible, even if it was seized therefrom in violation of the defendant's constitutional rights, pursuant to the inevitable discovery doctrine. See *State* v. *Shields*, 308 Conn. 678, 689 n.13, 69 A.3d 293 (2013), cert. denied, 571 U.S. 1176, 134 S. Ct. 1040, 188 L. Ed. 2d 123 (2014). We need not reach this alternative argument in light of our conclusion that the court's voluntariness finding was not clearly erroneous.

[9] We note that the rationale for the identification exception in § 8-5 (2) of the Connecticut Code of Evidence applies with equal force to positive identifications and nonidentifications. Section 8-5 (2) of the Connecticut Code of Evidence has two requirements: that the declarant is available for cross-examination and that the identification is reliable. If the Browns had been available for trial, the opportunity to test what they said or did during their reviews of the photographic array would have been the same regardless of whether they made an identification. Similarly, the reliability of the assertion resulting from the identification procedure is the same regardless of whether it resulted in a positive identification or a nonidentification. Consequently, had the Browns been available to testify at the defendant's trial, we see no reason why § 8-5 (2) of the Connecticut Code of Evidence would not apply to their failure to identify the defendant prior to trial.

[10] The state argues on appeal that the documents were irrelevant as offered for this purpose because the circumstances under which the Browns observed the shooter had not been admitted into evidence. We disagree with the state that the court abused its discretion in determining that the business records were relevant if offered for this purpose. See *State* v. *Fernando V.*, 331 Conn. 201, 212, 202 A.3d 350 (2019) (trial court's relevancy determination is subject to abuse of discretion review); see also §§ 4-1 and 4-2 of the Connecticut Code of Evidence; E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.1, pp. 144–46. This inference is relevant as exculpatory evidence as to whether the defendant was the individual who had shot the victim. If the Browns, who were in the proximity of 31 Kossuth Street when the victim was shot, were unable to identify the defendant, from a photographic array, as the shooter, this fact would tend

to make it more probable that the defendant was not the shooter.

_____